**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ST. LUKE'S HEALTH NETWORK, INC. d/b/a
ST. LUKE'S UNIVERSITY HEALTH
NETWORK,
801 Ostrum Street, Bethlehem, PA 18015;

SAINT LUKE'S HOSPITAL OF BETHLEHEM,
PENNSYLVANIA d/b/a ST. LUKE'S
UNIVERSITY HOSPITAL – BETHLEHEM
CAMPUS,
801 Ostrum Street, Bethlehem, PA 18015;

ST. LUKE'S QUAKERTOWN HOSPITAL,
1021 Park Avenue, Quakertown, PA 18951;

CARBON-SCHUYLKILL COMMUNITY
HOSPITAL d/b/a ST. LUKE'S MINERS
MEMORIAL HOSPITAL,
360 West Ruddle Street, Coaldale, PA 18218;

BLUE MOUNTAIN HOSPITAL d/b/a ST.
LUKE'S HOSPITAL – PALMERTON CAMPUS,
135 Lafayette Avenue, Palmerton, PA, 18071;

Individually and on behalf of all others similarly
situated,

*Plaintiffs*,

v.

LANCASTER GENERAL HOSPITAL,
555 North Duke Street, Lancaster, PA 17602;

LANCASTER GENERAL HEALTH,
555 North Duke Street, Lancaster, PA 17602;

UNIVERSITY OF PENNSYLVANIA HEALTH
SYSTEM,
3451 Walnut Street, Philadelphia, PA 19104;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT -- CLASS ACTION**

Civil Action No.:

**JURY TRIAL DEMANDED**

(*caption continued on next page*)

1

TRUSTEES OF THE UNIVERSITY OF          )
PENNSYLVANIA,                          )
3451 Walnut Street, Philadelphia, PA 19104;    )
                                       )
JOHN DOE 1,                            )
555 North Duke Street, Lancaster, PA 17602;    )
                                       )
and JOHN DOE 2,                        )
555 North Duke Street, Lancaster, PA 17602.    )
                                       )
            *Defendants*.              )

Plaintiffs ST. LUKE'S HEALTH NETWORK, INC. d/b/a ST. LUKE'S UNIVERSITY

HEALTH NETWORK; SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA

d/b/a ST. LUKE'S UNIVERSITY HOSPITAL – BETHLEHEM CAMPUS; ST. LUKE'S

QUAKERTOWN HOSPITAL; CARBON-SCHUYLKILL COMMUNITY HOSPITAL d/b/a ST.

LUKE'S MINERS MEMORIAL HOSPITAL; and BLUE MOUNTAIN HOSPITAL d/b/a ST.

LUKE'S HOSPITAL – PALMERTON CAMPUS, individually and on behalf of all others

similarly situated, by and through their undersigned counsel, Cooper & Kirk, PLLC and Webber

McGill LLC, file the within Class Action Complaint, and in support thereof, Plaintiffs aver as

follows:

## NATURE OF THE ACTION

1.      This case is about a scheme to dupe Pennsylvania officials into misdirecting

millions of dollars from a pot of money that is supposed to help hospitals across the

Commonwealth cover the cost of charity medical care they provide to some of the

Commonwealth's sickest uninsured citizens.

2.      Over the span of at least five fiscal years—Fiscal Years 2008 through 2012—

Defendants Lancaster General Hospital, Lancaster General Health, the University of Pennsylvania

2

Health System, and the Trustees of the University of Pennsylvania (collectively, "Lancaster General"), by and through their employees, John Doe 1 and John Doe 2, submitted hundreds of inaccurate and overstated claims to the Pennsylvania government's Extraordinary Expense Program ("the EE Program"), a program that maintains funds to compensate hospitals for their charity care.

3.      The scale and scope of this scheme is astonishing. The Pennsylvania Auditor General has found that from Fiscal Years 2010 through 2012, about 75% of all claims that Lancaster General submitted to the EE Program were invalid. By comparison, only about 10% of the claims submitted by all other hospitals combined were invalid. Put differently, Lancaster General submitted invalid claims at a rate 7.5 times higher than other hospitals.

4.      By submitting massive numbers of invalid and overstated claims on behalf of Lancaster General, John Doe 1 and John Doe 2 unlawfully diverted millions of dollars that should have been paid to the Plaintiffs and the Plaintiff Class. John Doe 1 and John Doe 2 knew that Lancaster General's claims were grossly inflated but nevertheless continued to submit them even after being called out by the Auditor General. For years, these fraudulent claims were transmitted to the Commonwealth over the Internet, and each transmission constituted an act of wire fraud under 18 U.S.C. § 1343. Together, these multiple acts of wire fraud formed a "pattern of racketeering activity" under 18 U.S.C. § 1962(c).

5.      The EE Program is not a bottomless pot of money. In fact, just the opposite is true. There has typically not been enough money in the fund to pay for all the extraordinary expense claims that hospitals submitted to the Commonwealth. And so, each hospital has been apportioned a pro rata share of the limited amount of money in the EE Program, payable according to each hospital's claimed share of the total extraordinary expense claims incurred in Pennsylvania each

year. Because Defendants submitted a shocking number of incorrect and overstated extraordinary expense claims, Lancaster General was paid far in excess of its pro rata share. This means that other hospitals—specifically, the named Plaintiffs and the Plaintiff Class—were underpaid their pro rata share and thereby injured in their business and property.

6.      From Fiscal Year 2010 through Fiscal Year 2012, Lancaster General was overpaid nearly $9 million from the EE Program. Given that only about $32.5 million in EE Program funds were distributed to hospitals during those three years, this means that *more than one out of every four dollars* disbursed during the relevant time period was improperly disbursed to Lancaster General. This also means that the Plaintiffs and the Plaintiff Class were undercompensated by nearly $9 million during those years.

7.      Unsurprisingly, Lancaster General has already effectively admitted that it would work a serious injustice for it to retain the millions of dollars in overpayments that it has received for Fiscal Years 2010 through 2012. Lancaster General was *also* overpaid millions of dollars for Fiscal Years 2008 and 2009, because it *also* submitted massive amounts of incorrect and overstated claims during those years. But Lancaster General later complied with the Commonwealth's instruction to return the money it was improperly overpaid during those two fiscal years, so that the money could be redistributed to hospitals that were underpaid. Lancaster General did not bring a legal challenge or otherwise question the legality of the Commonwealth's instruction that it repay its ill-gotten funds. Moreover, Lancaster General has for years maintained the millions of dollars in overpayment that are at issue in this case—i.e., the overpayments received for Fiscal Years 2010 through 2012—as a reserve on its financial books, set aside for later redistribution.

8.      Pennsylvania's Auditor General, who oversees the Extraordinary Expense Program, has already concluded, in a number of reports issued across several years, that Lancaster

4

General submitted huge numbers of incorrect and overstated claims and has been massively overcompensated under the EE Program. The Auditor General's meticulous reports identify, for all of the fiscal years relevant to this case, the precise amount by which Lancaster General was overpaid each year, and the precise amount by which Plaintiffs and the Plaintiff Class were underpaid each year.

9.      Nevertheless, Lancaster General has refused to repay the millions of dollars in ill-gotten funds it has received from the public fisc as a consequence of the hundreds of invalid and overstated extraordinary expense claims its employees submitted for Fiscal Years 2010 through 2012. In other words, Defendants are intent upon enriching themselves to the tune of millions of dollars, at the expense of Pennsylvania's neediest citizens and the hospitals that provide charity care to those citizens.

10.     Plaintiffs thus bring this class action complaint, on behalf of themselves and all others similarly situated, alleging claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as claims under Pennsylvania law for unjust enrichment, money had and received, and constructive trust. Plaintiffs ask this Court to award them and the Plaintiff Class treble damages, attorneys' fees, and the other relief to which they are entitled under federal and state law.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiffs' RICO claims under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331. This Court has subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this Court under 18 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because at least one Defendant resides in this district and all Defendants are residents of

Pennsylvania; Defendants transact their affairs in this district; a substantial portion of the events giving rise to this suit occurred in this district; a substantial part of property that is the subject of this action is situated in this district; and at least one Defendant is subject to personal jurisdiction with respect to this case.

## PARTIES

13.     Plaintiff ST. LUKE'S HEALTH NETWORK, INC. d/b/a ST. LUKE'S UNIVERSITY HEALTH NETWORK ("St. Luke's University Health Network" or "St. Luke's") is a non-profit corporation comprised of ten hospitals, a regional medical school campus, the nation's longest continuously operating nursing school, the largest hospital-based EMS service in Pennsylvania, more than 1,400 physicians and providers, numerous primary and specialist care sites, and various outpatient testing and service facilities. St. Luke's is headquartered and has its principal place of business in Bethlehem, Pennsylvania. St. Luke's brings this case individually and on behalf of all others similarly situated.

14.     Plaintiff SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA d/b/a ST. LUKE'S UNIVERSITY HOSPITAL – BETHLEHEM CAMPUS ("St. Luke's Bethelem") is a non-profit corporation and a member of the St. Luke's University Health Network. St. Luke's Bethlehem is headquartered and has its principal place of business in Bethlehem, Pennsylvania. St. Luke's Bethlehem brings this case individually and on behalf of all others similarly situated.

15.     Plaintiff ST. LUKE'S QUAKERTOWN HOSPITAL ("St. Luke's Quakertown") is a non-profit corporation and a member of the St. Luke's University Health Network. St. Luke's Quakertown is headquartered and has its principal place of business in Quakertown, Pennsylvania. St. Luke's Quakertown brings this case individually and on behalf of all others similarly situated.

16.     Plaintiff CARBON-SCHUYLKILL COMMUNITY HOSPITAL d/b/a ST. LUKE'S MINERS MEMORIAL HOSPITAL ("St. Luke's Miners") is a non-profit corporation and a member of the St. Luke's University Health Network. St. Luke's Miners is headquartered and has its principal place of business in Coaldale, Pennsylvania. St. Luke's Miners brings this case individually and on behalf of all others similarly situated.

17.     Plaintiff BLUE MOUNTAIN HOSPITAL d/b/a ST. LUKE'S HOSPITAL – PALMERTON CAMPUS ("St. Luke's Palmerton") is a non-profit corporation and a member of the St. Luke's University Health Network. St. Luke's Palmerton is headquartered and has its principal place of business in Palmerton, Pennsylvania. St. Luke's Palmerton brings this case individually and on behalf of all others similarly situated.

18.     Defendant LANCASTER GENERAL HOSPITAL ("Lancaster General Hospital") is a corporation that is part of Lancaster General Health/Penn Medicine, a member of the University of Pennsylvania Health System. Lancaster General Hospital is headquartered and has its principal place of business in Lancaster, Pennsylvania.

19.     Defendant LANCASTER GENERAL HEALTH ("Lancaster General Health") is a corporation that is a member of the University of Pennsylvania Health System. Lancaster General Health's network encompasses Lancaster General Hospital. Lancaster General Health is headquartered and has its principal place of business in Lancaster, Pennsylvania.

20.     Defendant UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM ("Penn Medicine") is a medical entity that oversees and operates multiple hospitals and medical facilities in Pennsylvania, including Lancaster General Hospital and Lancaster General Health. Penn Medicine is a division of the Trustees of the University of Pennsylvania. Penn Medicine is headquartered in and has its principal place of business in Philadelphia, Pennsylvania.

7

21.     Defendant TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA ("University of Pennsylvania") is a corporation that owns and operates Penn Medicine, Lancaster General Hospital, and Lancaster General Health. The University of Pennsylvania is headquartered in and has its principal place of business in Philadelphia, Pennsylvania.

22.     Defendant JOHN DOE 1 is an employee of Lancaster General who developed and oversaw implementation of the fraudulent claims submission policy that is the subject of this lawsuit.

23.     Defendant JOHN DOE 2 is an employee of Lancaster General who implemented the fraudulent claims submission policy by submitting the fraudulent claims to the Department and the Commonwealth of Pennsylvania via the wires.

## FACTS

**The Tobacco Settlement Act's Extraordinary Expense Program.**

24.     In November 1998, Pennsylvania and 45 other States entered into the "Master Settlement Agreement" with some of the nation's largest cigarette manufacturers. The Master Settlement Agreement released the cigarette manufacturers from claims regarding the advertising, marketing, and promotion of cigarettes in exchange for about $206 billion over 25 years. These payments were designed in part to allow the States to recover the massive amounts of tobacco-related health care costs they would have to incur in the coming years.

25.     In June 2001, the Pennsylvania General Assembly enacted the Tobacco Settlement Act, P.L. 755, No. 77, *as amended*, 35 PA. CONS. STAT. § 5701.101 *et seq.* ("the Act"), to allocate Pennsylvania's share of the Master Settlement Agreement funds. We refer to this money as the "Tobacco Settlement Fund." Pursuant to the Act, Pennsylvanians decided to allocate the Commonwealth's Tobacco Settlement Fund to hospitals that provide charity care. The Act's

8

purpose was to offset the losses that these hospitals regularly incurred when they provided this charity care to Pennsylvania's neediest citizens.

26.     The Act established two programs to allocate the Tobacco Settlement Fund: the Hospital Uncompensated Care Program ("the UC Program"), and the Hospital Extraordinary Expenses Program ("the EE Program"). The UC Program receives 85% of the funding, while the EE Program receives the remaining 15% of the funding. 35 PA. CONS. STAT. § 5701.1106(b).

27.     The UC Program provides compensation to hospitals that meet certain statutory criteria, including that they accept all individuals regardless of their ability to pay for emergent medically necessary services. 35 PA. CONS. STAT. § 5701.1104(b)(1). The UC Program is not at issue in this case.

28.     This case is about recipients of funds under the EE Program, which makes funds available to reimburse hospitals that do not receive funds pursuant to the UC program. The EE Program reimburses these hospitals for "extraordinary expenses" they incur when they treat persons without health insurance, such as high cost trauma patients. The Act defines "extraordinary expenses" as the cost of hospital inpatient services provided to an uninsured patient which exceeds twice the hospital's average cost per stay for all patients. 35 PA. CONS. STAT. § 5701.1102.

29.     The Act specifies how EE Program funds must be distributed to participating hospitals. The Act states that the payment to participating hospitals shall equal the lesser of: (1) the hospital's extraordinary expenses or (2) the prorated amount of each hospital's percentage of extraordinary expense costs as compared to all eligible hospitals' extraordinary expense costs, as applied to the total funds available in the Hospital Extraordinary Expense Program for the fiscal year. 35 PA. CONS. STAT. § 5701.1105(d).

9

30.     Hospitals submit their extraordinary expense data through an Internet portal to the Pennsylvania Health Care Cost Containment Council ("the PHC4" or "the Council"). Hospitals have an opportunity to submit claims on a quarterly basis, and then they may adjust their claims for accuracy about 18 months after their final quarterly submission for a given fiscal year.

31.     The Act prohibits hospitals from submitting invalid or overstated extraordinary expense claims, from being compensated for invalid or overstated extraordinary expense claims, and from receiving or retaining more money from the EE Program than the hospital is entitled to receive or retain under the Act. The Act further states that in no case shall payments to a hospital under the statute exceed the aggregate cost of services furnished to patients with extraordinary expenses.

32.     The EE Program is overseen by the Pennsylvania Department of Human Services and formerly by its predecessor the Department of Public Welfare (collectively, "the Department") and by the Pennsylvania Auditor General ("the Auditor General"). The Department allocates funds pursuant to the EE Program, and the Auditor General reviews the accuracy of those allocations. During some past fiscal years, the Department used the results of the Auditor General's report to claw back and redistribute funds that were incorrectly overpaid to Lancaster General and other hospitals.

33.     The Department's duties include, *inter alia*, the administration of the EE Program; the collection of data necessary to administer the EE Program, including but not limited to data from the Council; and the duty to contact the appropriate data source if there is missing data or there is a need to obtain any other necessary information.

10

**Total Payments Made Under the EE Program.**

34.     For Fiscal Years 2010 through 2012, the total amount of extraordinary expenses claimed by participating hospitals exceeded the total funds available in the EE Program. For example, for Fiscal Year 2011, 67 hospitals submitted extraordinary expense claims totaling about $14 million, but the Department had less than $11 million to allocate under the EE Program that year.

35.     Because the EE Program was initially "oversubscribed" in each of these years, if one hospital entered invalid or inflated extraordinary expense claims, that hospital would receive an unjustly high proportion of the EE Program funds. This necessarily means that other hospitals— those hospitals that did not enter incorrect or overstated extraordinary expense claims—would receive less money than they are entitled to under the Act. For example, if Hospital A incorrectly claimed $8 million in extraordinary expenses when it had in fact incurred only $1 million in extraordinary expenses, Hospital A would be over-compensated. Hospitals B, C, and D, which correctly reported the amount of their extraordinary expense claims, would receive substantially less than the pro rata share they are entitled to under the Act.

36.     Across Fiscal Years 2010 through 2012, the Department made payments of about $32.5 million to Pennsylvania hospitals pursuant to the EE Program.

37.     For Fiscal Year 2010, in November 2010, the Department distributed $13,280,546 in extraordinary expense payments to 70 hospitals, based on 789 extraordinary expense claims submitted for the period July 1, 2007 to June 30, 2008. However, as concluded by a later audit of the Pennsylvania Auditor General, only 489 of those claims—or 62% of all claims—were allowable, while an additional 47 claims not included in the Department's database were allowable. The Auditor General determined that the Department made a net overpayment of

11

$859,496. The Auditor General also determined that 54 hospitals were underpaid a total of $4,727,010, and 16 hospitals were overpaid a total of $5,586,506. *See* EUGENE A. DEPASQUALE, PENNSYLVANIA AUDITOR GENERAL, SUMMARY REPORT ON THE RESULTS OF THE INDIVIDUAL REVIEWS OF 70 HOSPITALS RECEIVING EXTRAORDINARY EXPENSE TOBACCO FUND PAYMENTS AND 94 HOSPITALS RECEIVING UNCOMPENSATED CARE TOBACCO FUND PAYMENTS FROM THE DEPARTMENT OF PUBLIC WELFARE IN NOVEMBER 2010 (May 23, 2014) (attached as Exhibit A).

38.     For Fiscal Year 2011, in November 2011, the Department distributed $10,911,974 in extraordinary expense payments to 68 hospitals, based on 486 extraordinary expense claims submitted for the period July 1, 2008 to June 30, 2009. However, as concluded by a later audit of the Pennsylvania Auditor General, only 387 of those claims—or 80% of all claims—were allowable, while an additional 50 claims not included in the Department's database were allowable. The Auditor General determined that the Department made a net overpayment of $855,649. The Auditor General also determined that 46 hospitals were underpaid a total of $1,941,963, and 22 hospitals were overpaid a total of $2,797,612. *See* EUGENE A. DEPASQUALE, PENNSYLVANIA AUDITOR GENERAL, HOSPITALS' SUBSIDY ENTITLEMENT TO EXTRAORDINARY EXPENSE AND UNCOMPENSATED CARE PAYMENTS RECEIVED FROM THE DEPARTMENT OF PUBLIC WELFARE IN NOVEMBER 2011 (Oct. 2, 2014) (attached as Exhibit B).

39.     For Fiscal Year 2012, in August 2012, the Department distributed $8,462,497 in extraordinary expense payments to 66 hospitals, based on 800 extraordinary expense claims submitted for the period July 1, 2009 to June 30, 2010. However, as concluded by a later audit of the Pennsylvania Auditor General, only 586 of those claims—or 73% of all claims—were allowable, while an additional 29 claims not included in the Department's database were allowable. The Auditor General determined that 48 hospitals were underpaid a total of $2,090,989,

12

and that 18 hospitals were overpaid by that same amount. *See* EUGENE A. DEPASQUALE, PENNSYLVANIA AUDITOR GENERAL, HOSPITALS' SUBSIDY ENTITLEMENT TO EXTRAORDINARY EXPENSE AND UNCOMPENSATED CARE PAYMENTS RECEIVED FROM THE DEPARTMENT OF HUMAN SERVICES IN AUGUST 2012 (Apr. 15, 2015) (attached as Exhibit C).

40.     The following table summarizes the total payments actually made pursuant to the EE Program from Fiscal Year 2010 through Fiscal Year 2012:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| **Participating Hospitals** | 70 | 68 | 66 |
| **Amount Paid by DHS ($M)** | $13.3 | $10.9 | $8.5 |
| **Overpaid Hospitals** | 16 | 22 | 18 |
| **Amount Overpaid ($M)** | $5.6 | $2.8 | $2.1 |
| **Underpaid Hospitals** | 54 | 46 | 48 |
| **Amount Underpaid** | $4.7 | $1.9 | $2.1 |
| **Net Overpayment ($M)** | $0.9 | $0.9 | -- |

**Defendants Massively Inflate Lancaster General's Extraordinary Expense Claims.**

41.     This case is about Defendants' years-long practice of submitting massively inflated extraordinary expense claims. As a consequence of these invalid extraordinary expense claims, Lancaster General has been unjustly enriched by about $9 million from the EE Program for Fiscal Years 2010 through 2012. Put differently, more than 25% of all moneys distributed from the EE Program over these three years were wrongfully and unlawfully allocated to Lancaster General rather than Plaintiffs and the Plaintiff Class.

42.     For Fiscal Year 2008, Lancaster General Hospital: (a) submitted on or about November 30, 2005, claims for payments based on claims from July 1 to September 30, 2005; (b) submitted on or about February 28, 2006, claims for payments based on claims from October 1 to December 31, 2005; (c) submitted on or about May 31, 2006, claims for payments based on claims from January 1 to March 31, 2006; (d) submitted on or about August 31, 2006, claims for payments based on claims from April 1 to June 30, 2006; and (e) submitted its annual verification of these claims on or about February 10, 2008.

43.     Sometime before March 2008, John Doe 1, an employee at Lancaster General, developed a plan whereby the hospital would pad the claims it submitted to the Commonwealth through the PHC4 Internet portal and thereby secure for Lancaster General more than its lawful funding under the EE Program. To that end, on or around February 10, 2008, as well as during the quarterly submission dates for Fiscal Year 2008 identified above, John Doe 1 instructed John Doe 2—another Lancaster General employee—to prepare and submit through the PHC4 portal materials purporting to show that, during Fiscal Year 2008, Lancaster General Hospital was entitled to $2.8 million under the EE Program. A July 26, 2010 report by the Auditor General would later reveal that for Fiscal Year 2008 Lancaster General Hospital was entitled to less than half that amount, or only $1.1 million from the EE Program. John Doe 1 and John Doe 2 knew that the Fiscal Year 2008 submissions were false, and each transmission of information over the Internet through the PHC4 portal for Fiscal Year 2008 constituted a separate act of wire fraud under 18 U.S.C. § 1343.

44.     For Fiscal Year 2009, Lancaster General Hospital: (a) submitted on or about November 30, 2006, claims for payments based on claims from July 1 to September 30, 2006; (b) submitted on or about February 28, 2007, claims for payments based on claims from October

14

1 to December 31, 2006; (c) submitted on or about May 31, 2007, claims for payments based on claims from January 1 to March 31, 2007; (d) submitted on or about August 31, 2007, claims for payments based on claims from April 1 to June 30, 2007; and (e) submitted its annual verification of these claims on or about February 10, 2009.

45.     John Doe 1 and John Doe 2 were again responsible for misrepresentations made to the Commonwealth through submissions on the PHC4 Internet portal for Fiscal Year 2009. On or about February 10, 2009, as well as during the quarterly submission dates for Fiscal Year 2009 identified above, John Doe 1 instructed John Doe 2 to prepare and submit through the PHC4 portal materials purporting to show that during the relevant period Lancaster General Hospital had incurred total costs qualifying for reimbursement under the EE Program of over $7.9 million. A February 16, 2012 report by the Auditor General would later determine that Lancaster General Hospital had only $1.3 million in qualifying expenses. In other words, the 2009 Fiscal Year submission prepared by John Doe 1 and John Doe 2 falsely represented that Lancaster General Hospital incurred roughly *six times* more in qualifying extraordinary expenses than it had actually incurred. As a result of this misrepresentation, Lancaster General Hospital received nearly $2.9 million from the EE Program that should have been distributed to Plaintiffs and other members of the Plaintiff Class in Fiscal Year 2009. The transmission of each of the fraudulent Fiscal Year 2009 submissions over the Internet by John Doe 1 and John Doe 2 was a separate act of wire fraud under 18 U.S.C. § 1343.

46.     In sum, by and through John Doe 1 and John Doe 2, Lancaster General submitted massive amounts of invalid or overstated extraordinary expense claims for Fiscal Years 2008 and 2009, resulting in millions of dollars of overcompensation. For Fiscal Year 2008, Lancaster General was overpaid $1.7 million, representing 62% of the $2.8 million in overpayments made

that year. For Fiscal Year 2009, Lancaster General was overpaid $2.9 million, representing 73%
of the $3.9 million in overpayments that year. The Commonwealth ultimately ordered Lancaster
General to repay excess sums it collected under the EE Program for Fiscal Years 2008 and 2009.
But, as detailed below, John Doe 1 and John Doe 2 continued to submit fraudulent claims to the
Commonwealth for Fiscal Years 2010, 2011, and 2012. Lancaster General has not repaid the
excess sums it received from the EE Program during Fiscal Years 2010, 2011, and 2012.

47.     For Fiscal Year 2010, Lancaster General Hospital: (a) submitted on or about
November 30, 2007, claims for payments based on claims from July 1 to September 30, 2007;
(b) submitted on or about February 29, 2008, claims for payments based on claims from October
1 to December 31, 2007; (c) submitted on or about May 31, 2008, claims for payments based on
claims from January 1 to March 31, 2008; (d) submitted on or about August 31, 2008, claims for
payments based on claims from April 1 to June 30, 2008; and (e) submitted its annual verification
of these claims on or about February 10, 2010.

48.     On or about February 10, 2010, as well as during the quarterly submission dates for
Fiscal Year 2010 identified above, John Doe 1 instructed John Doe 2 to prepare and submit through
the PHC4 portal Lancaster General Hospital's Fiscal Year 2010 EE program claims. These
submissions represented that during the relevant period Lancaster General Hospital had 297
qualifying claims for which it incurred almost $11 million in expenses. For Fiscal Year 2010,
Lancaster General Hospital's claimed expenses represented 46.7% of all qualifying expenses
claimed by all hospitals—a figure that shows that the submission was so grossly inflated that those
who prepared it knew or should have known it was false. A May 23, 2014 report by the Auditor
General reveals that in fact only 51 of those claims were qualifying claims, and that Lancaster
General Hospital should have received only $1.3 million for Fiscal Year 2010. As a result of these

16

misrepresentations, Lancaster General Hospital received roughly $4.9 million from the EE Program that should have been distributed to Plaintiffs and other members of the Plaintiff Class in Fiscal Year 2010. Each of the fraudulent Fiscal Year 2010 transmissions sent over the Internet by John Doe 1 and John Doe 2 was a separate act of wire fraud under 18 U.S.C. § 1343.

49.     For Fiscal Year 2011, Lancaster General Hospital: (a) submitted on or about November 30, 2008, claims for payments based on claims from July 1 to September 30, 2008; (b) submitted on or about February 28, 2009, claims for payments based on claims from October 1 to December 31, 2008; (c) submitted on or about May 31, 2009, claims for payments based on claims from January 1 to March 31, 2009; (d) submitted on or about August 31, 2009, claims for payments based on claims from April 1 to June 30, 2009; and (e) submitted its annual verification of these claims on February 10, 2011.

50.     On or about February 10, 2011, as well as during the quarterly submission dates for Fiscal Year 2011 identified above, John Doe 1 instructed John Doe 2 to prepare and submit still more fraudulent EE Program reimbursement requests through the PHC4 portal. The Fiscal Year 2011 submissions claimed that Lancaster General Hospital had 111 qualifying claims for which it had incurred more than $4.6 million in expenses. But an October 2, 2014 report by the Auditor General shows that in fact only 31 of those claims were qualifying claims, and that Lancaster General Hospital should have received only about $1.2 million in Fiscal Year 2011. The falsehoods in the Fiscal Year 2011 induced the Commonwealth to disburse almost $2.4 million to Lancaster General Hospital that should have been paid to Plaintiffs and other members of the Plaintiff Class in Fiscal Year 2011. The transmissions of the fraudulent Fiscal Year 2011 submissions over the Internet by John Doe 1 and John Doe 2 were acts of wire fraud under 18 U.S.C. § 1343.

17

51.     For Fiscal Year 2012, Lancaster General Hospital: (a) submitted on or about November 30, 2009, claims for payments based on claims from July 1 to September 30, 2009; (b) submitted on or about February 28, 2010, claims for payments based on claims from October 1 to December 31, 2009; (c) submitted on or about May 31, 2010, claims for payments based on claims from January 1 to March 31, 2010; (d) submitted on or about August 31, 2010, claims for payments based on claims from April 1 to June 30, 2010; and (e) submitted its annual verification of these claims on February 9, 2012.

52.     On or about February 9, 2012, as well as during the quarterly submission dates for Fiscal Year 2012 identified above, John Doe 1 instructed John Doe 2 to prepare and submit through the PHC4 portal additional fraudulent EE Program reimbursement requests. These submissions stated that Lancaster General Hospital had 188 qualifying claims for Fiscal Year 2012 for which it incurred expenses of over $8 million. But an April 15, 2015 report by the Auditor General revealed that in fact only 58 of those claims were qualifying claims, and that Lancaster General Hospital should have received only $1.1 million in Fiscal Year 2012. As a result of the misrepresentations in the Fiscal Year 2012 submissions, Lancaster General Hospital received over $1.5 million from the EE Program that should have been distributed to Plaintiffs and other members of the Plaintiff Class. The transmissions of the fraudulent Fiscal Year 2012 submissions over the Internet by John Doe 1 and John Doe 2 were acts of wire fraud under 18 U.S.C. § 1343.

53.     As detailed above, John Doe 1 and John Doe 2 engaged in a years-long practice of submitting invalid and inflated EE Program reimbursement requests to the Commonwealth. For example, they submitted claims on behalf of Lancaster General Hospital for service that was not provided to an uninsured patient and that did not exceed twice the hospital's average cost per stay for all patients. These claims were invalid or overstated for a number of reasons including that the

18

patients were not in fact uninsured, the cost of service did not exceed the hospital's actual average cost per stay for all patients, Lancaster General Hospital received partial or total compensation for the care, and Lancaster General Hospital never even provided the care that they claimed to have provided in their claims submissions. Lancaster General Hospital's actual pro rata share of submitted, qualified claims was far smaller than the share used in the Department's initial distribution.

54.    From Fiscal Year 2010 through Fiscal Year 2012, Lancaster General Hospital submitted a total of 596 claims under the EE Program, or about 30% of all extraordinary expense claims submitted by all approximately 100 hospitals across that three-year period. Fully 456 of Lancaster General Hospital's claims were rejected as invalid by the Auditor General, which means that more than 75% of all the claims they submitted were invalid. In other words, the overwhelming majority of claims they submitted were invalid. By contrast, only 157 of the 1,479 claims submitted by *all other hospitals combined*—or about 10% of other hospitals' claims—were invalid. Lancaster General thus submitted invalid claims at a rate 7.5 times higher than all other hospitals.

55.    The circumstances surrounding Lancaster General's EE Program reimbursement requests make plain that John Doe 1 and John Doe 2 knew that they were making false representations. Even after the Auditor General released a report on July 26, 2010 that revealed that Lancaster General Hospital's reimbursement request for Fiscal Year 2008 was grossly inflated, John Doe 1 and John Doe 2 continued to transmit inaccurate claims and expense data to the Commonwealth for two additional fiscal years. Moreover, Lancaster General had 18 months or more to confirm the accuracy and reconcile its claims before submitting its annual verification for any particular year, yet Lancaster General failed to correct the false and fraudulent submissions for which John Doe 1 and John Doe 2 were responsible.

19

56. The fraudulent intent of John Doe 1 and John Doe 2 is further demonstrated by the fact that Lancaster General submitted invalid or overstated claims for reimbursement that far outpaced the false-claim rate for other hospitals. The massive amounts by which Lancaster General was overcompensated demonstrate that John Doe 1 and John Doe 2 deliberately engaged in a scheme, lasting at least during the submission periods for Fiscal Years 2008 through 2012, to submit extraordinary expense claims, knowing they were false. The aim of this scheme was to defraud the Department, the Auditor General, the PHC4, the citizens of Pennsylvania, and Plaintiffs and the Plaintiff Class—i.e., the dozens of law-abiding hospitals that provide care to Pennsylvania's neediest citizens. Indeed, Lancaster General's own in-house finance department has admitted that the hospital was systematically overpaid.

57. Defendants' scheme caused Lancaster General to be massively overcompensated under the EE Program. Between 2010 and 2012, Lancaster General was paid about $12.4 million under the EE Program, but in fact it should have been paid only about $3.6 million, or less than 30% of what it was actually paid. Lancaster was overpaid roughly $8.8 million over those three fiscal years.

58. The overpayments to Lancaster General and underpayments to Plaintiffs and the Plaintiff Class were made over the interstate wires by the Department on or about the following dates: November 29, 2010, for Fiscal Year 2010; November 14, 2011, for Fiscal Year 2011; and August 27, 2012, for Fiscal Year 2012. Each of these transmissions constituted wire fraud because they were an integral part of the scheme by John Doe 1 and John Doe 2 to defraud the EE Program and deprive the named Plaintiffs and the Plaintiff Class of funds to which they were entitled. Each of these transmissions was made from the Department to Lancaster General Hospital.

20

59.   The following table identifies, for Fiscal Year 2010 through Fiscal Year 2012, (1) the number of claims Defendants submitted under the EE program, (2) the number of its claims that were rejected, (3) the amount of extraordinary expense claims requested by Defendants, (4) the amount actually paid to Defendants under the EE Program based on the false and fraudulent submissions, (5) the amount it would have received if it had only submitted legitimate extraordinary expense claims, and (6) the amount by which it has been overpaid and unjustly enriched:

| Lancaster General Hospital Overpayment (2010 – 2012) | |
| --- | --- |
| **FYE 2010** | |
| Claims Made | 297 |
| Claims Rejected | 246 |
| Amount of EE Claims Submitted | $10,972,087 |
| Amount Paid By the Department | $6,213,283 |
| Legitimate Entitlement | $1,304,660 |
| Unjust Enrichment | **$4,908,623** |
| **FYE 2011** | |
| Claims Made | 111 |
| Claims Rejected | 80 |
| Amount of EE Claims Submitted | $4,601,155 |
| Amount Paid By the Department | $3,602,785 |
| Legitimate Entitlement | $1,226,321 |
| Unjust Enrichment | **$2,376,464** |
| **FYE 2012** | |
| Claims Made | 188 |
| Claims Rejected | 130 |
| Amount of EE Claims Submitted | $8,022,333 |
| Amount Paid By the Department | $2,616,519 |
| Legitimate Entitlement | $1,109,081 |
| Unjust Enrichment | **$1,507,438** |

60.     The Auditor General has recognized that Defendants have submitted an enormous amount of invalid or overstated claims, causing them to receive many millions of dollars in overpayment. For Fiscal Years 2010 through 2012, the Auditor General has issued reports identifying the amount by which each hospital has been underpaid or overpaid pursuant to the EE Program. The Auditor General has thus already conducted the appropriate damages calculation for this case.

61.     The Auditor General has criticized Lancaster General for submitting massive amounts of invalid or overstated claims to the Department and for helping itself to literally millions of dollars in ill-gotten overpayments. The Auditor General emphasized in an October 2014 report on the Fiscal Year 2011 distribution that "one hospital, Lancaster General, accounted for 85% of the $2.8 million in overpayments made to 22 hospitals." The following year, in April 2015, the Auditor General emphasized that "[f]or the 2012 extraordinary expense payment, one hospital (Lancaster General Hospital) accounts for 72% of the $2.1 million in overpayments made to 18 hospitals."

62.     Defendants apparently stopped their practice of submitting massive amounts of invalid or inflated claims in Fiscal Year 2013. In that year, Lancaster General Hospital submitted only 23 claims and received only $488,100 in extraordinary expense payments that year. The Auditor General ultimately determined that Lancaster General Hospital should have been paid $863,957 that year.

63.     The following chart illustrates the massive number of illegitimate claims Defendants submitted from Fiscal Year 2010 through Fiscal Year 2013. The light grey bar represents the claims that Defendants actually submitted and the dark grey bar represents the number of those claims that were legitimate. The significant drop-off in claims in 2013, when

22

Defendants apparently halted their years-long practice of deliberately or recklessly submitting invalid extraordinary expense claims, shows just how inflated their claims were from Fiscal Years 2010 through 2012:



64.     The following chart illustrates the massive overpayments Defendants received from Fiscal Year 2010 through Fiscal Year 2013. The light grey bar represents the payments that Defendants received, and the dark grey bar represents the amount that Defendants should have been paid during that time period. Once again, the massive drop-off in the amount that Defendants received in 2013 indicates the scale of the hospital's unjust enrichment during the previous years:



65.     Defendants' misrepresentations were material to the Department's decision to allocate to Lancaster General a greater share of the EE Program than it was entitled to under law, and the Department relied upon those misrepresentations when it disbursed extraordinary expense payments to Lancaster General for Fiscal Years 2008 through 2012.

66.     John Doe 1 and John Doe 2 made their representations with the intent of misleading the Pennsylvania government, including the Department, and Plaintiffs and the Plaintiff Class, into relying on the misrepresentations about how much extraordinary expense funds Lancaster General Hospital was entitled to.

67.     The Department conferred a benefit upon Lancaster General by overpaying it funds from the EE Program fund. Plaintiffs and the Plaintiff Class conferred a benefit upon Lancaster General by submitting their extraordinary expense claims in good faith, and by not submitting a massive number of incorrect, invalid, and inflated claims, thereby not overstating their entitlement to funds under the EE Program.

68.     Defendants' submission of the incorrect and overstated EE Program claims was deliberate and fraudulent, but in the alternative, it was unintentional, accidental, and negligent.

24

69. Although the information about which entity possesses the overpaid moneys is in the exclusive possession of the Defendants, on information and belief, Lancaster General Hospital, Lancaster General Health, Penn Medicine, and the University of Pennsylvania are in possession of the overpaid funds.

**Lancaster General's Invalid Claims Injure the Plaintiff Class.**

70. Defendants' submission of a massive amount of invalid or overstated extraordinary expense claims injured Plaintiffs and the Plaintiff Class, and unjustly enriched Lancaster General at the expense of Plaintiffs and the Plaintiff Class.

71. As discussed, from Fiscal Year 2010 through Fiscal Year 2012, the EE Program was "oversubscribed": the amount of reimbursement requests submitted exceeded the total amount of money in the EE Program's fund. Accordingly, each hospital received a pro rata share of the total fund. Because Defendants incorrectly claimed to have incurred extraordinary expenses far in excess of what they actually incurred, other hospitals—Plaintiffs and the Plaintiff Class—were undercompensated by millions of dollars.

72. For example, because of Lancaster General's invalid claims, the named Plaintiffs received about $580,000 less than they should have received under the Act.

73. St. Luke's Bethlehem participated in the EE Program in FYE 2010. St. Luke's Bethlehem was paid $1,273,310 under the EE Program that year, but it should have been paid $1,826,568. St. Luke's Bethlehem was therefore undercompensated $553,258 during FYE 2010.

74. St. Luke's Quakertown participated in the EE Program in FYE 2010 and FYE 2011. St. Luke's Quakertown was paid $14,790 under the EE Program in FYE 2010, and $22,101 in FYE 2011. However, St. Luke's Quakertown should have been paid $26,501 in FYE 2010, and

$29,173 in FYE 2011. St. Luke's Quakertown was thus undercompensated $11,711 during FYE 2010, and $7,072 in FYE 2011.

75. St. Luke's Miner's participated in the EE Program in FYE 2011. (The hospital is identified as "Miners Memorial Medical Center" in the Auditor General's report for Fiscal Year 2011). St. Luke's Miner's was paid $16,520 under the EE Program that year, but it should have been paid $21,183. St. Luke's Miner's was therefore undercompensated $4,663 during FYE 2011.

76. St. Luke's Palmerton participated in the EE Program in FYE 2012. (The hospital is identified as "Palmerton Hospital" in the Auditor General's report for Fiscal Year 2012.) St. Luke's Palmerton was paid $6,995 under the EE Program that year, but it should have been paid $10,478. St. Luke's Palmerton was therefore undercompensated $3,483 during FYE 2012.

77. The following table identifies, for FYE 2010 through FYE 2012, (1) the number of claims the named Plaintiffs submitted under the EE program, (2) the number of legitimate claims they had that year, (3) the amount actually paid to those hospitals under the EE Program, (4) the amount these hospitals were entitled to under the Act, and (5) the amount by which the hospitals were underpaid each Fiscal Year:

26

|  | St. Luke's Bethlehem | St. Luke's Quakertown | St. Luke's Miner's | St. Luke's Palmerton |
|---|---|---|---|---|
| **FYE 2010** |  |  |  |  |
| Claims Made | 67 | 2 | -- | -- |
| Legit Claims | 53 | 2 | -- | -- |
| Amount Paid | $1,273,310 | $14,790 | -- | -- |
| Legit Entitlement | $1,826,568 | $26,501 | -- | -- |
| Amt. Underpaid | **($553,258)** | **($11,711)** | -- | -- |
| **FYE 2011** |  |  |  |  |
| Claims Made | -- | 2 | 1 | -- |
| Legit Claims | -- | 2 | 1 | -- |
| Amount Paid | -- | $22,101 | $16,520 | -- |
| Legit Entitlement | -- | $29,173 | $21,183 | -- |
| Amt. Underpaid | -- | **($7,072)** | **($4,663)** | -- |
| **FYE 2012** |  |  |  |  |
| Claims Made | -- | -- | -- | 1 |
| Legit Claims | -- | -- | -- | 1 |
| Amount Paid | -- | -- | -- | $6,995 |
| Legit Entitlement | -- | -- | -- | $10,478 |
| Amt. Underpaid | -- | -- | -- | **($3,483)** |

78.     About 74 hospitals were net underpaid about $8.4 million from Fiscal Years 2010 through 2012.

79.     The following table identifies, for Fiscal Years 2010 through 2012, (1) the approximate number of undercompensated hospitals that are members of the Plaintiff Class, and (2) the approximate amount by which the hospitals were undercompensated:

|  | 2010 | 2011 | 2012 |
|---|---|---|---|
| **Underpaid Class Members** | 49 | 43 | 45 |
| **Amount of Underpayment ($M)** | $4.6 | $1.9 | $2.1 |

## Lancaster General Admits That It Has Been Unjustly Enriched and Holds Its Funds In a Constructive Trust.

80. As discussed above, Defendants submitted invalid and inflated extraordinary expense claims for Fiscal Years 2008 and 2009. As a consequence of these improper claims, Lancaster General was overpaid about $1.7 million in FYE 2008 and about $2.9 million in FYE 2009. With respect to these overpayments for Fiscal Years 2008 and 2009, the Department, at the suggestion and insistence of the Auditor General, required Lancaster General Hospital and other overpaid hospitals to repay the overpaid money for redistribution to hospitals that were improperly underpaid. Thus although Lancaster General was overpaid more than $4.5 million for Fiscal Years 2008 and 2009, Lancaster General has not retained those overpayments. Those overpaid amounts have been transferred to their rightful owners, i.e., the hospitals that were underpaid during those years, including members of the Plaintiff Class.

81. Lancaster General did not initiate legal action or otherwise object to the Department and Auditor General's determination that it had been overpaid for Fiscal Years 2008 and 2009, and that it must repay the amounts by which it has been overpaid. Lancaster General has therefore already admitted that it is not entitled to retain any overpayments they received, and that it holds that money in trust for Plaintiffs and the Plaintiff Class.

82. Just as Lancaster General recognized that it was not entitled to retain overpayments for Fiscal Years 2008 and 2009, it has also recognized that it is not entitled to retain overpayments for Fiscal Years 2010 to 2012. Lancaster General employees have admitted, including in a

28

conversation between Lancaster General finance employees and St. Luke's finance employees in early 2016, that Lancaster General has maintained the overpayments for Fiscal Years 2010 to 2012 on its books as "reserves" that are payable for future redistribution to the hospitals that were underpaid during those years.

83.     Only on or after the release of the May 23, 2014 report by the Auditor General was it publicly revealed for the first time that the Department would not require hospitals that had been overpaid during Fiscal Years 2010 to 2012 to pay back their overpayments for reallocation to hospitals that had been underpaid. Indeed, the Department did not definitively decide that it would not require such reallocations until sometime in 2016.

84.     The Auditor General and the Department did not conduct an audit of Fiscal Years 2008 and 2009 until several years after those funds were initially distributed to the recipient hospitals. Lancaster General and other hospitals that were overpaid in Fiscal Year 2008 were not required to pay back those overpayments until January 18, 2011. Lancaster General and other hospitals that were overpaid in Fiscal Year 2009 were not required to pay back those overpayments until June 21, 2012. Accordingly, Plaintiffs and the Plaintiff Class had an expectation that the Department would make Lancaster General pay back any overpayments for Fiscal Years 2010 to 2012, and that Lancaster would comply with this order. Further, Plaintiffs and the Plaintiff Class did not know (and could not have known) whether they were underpaid or overpaid, and whether other hospitals including Lancaster General Hospital were overpaid, in any given Fiscal Year until after the release of the audit report for the particular Fiscal Year.

85.     Plaintiffs and the Plaintiff Class did not become aware of their injuries until after May 23, 2014 at the earliest, which is the release date for the Auditor General's audit for Fiscal Year 2010. In that report, the Auditor General publicly disclosed for the first time that Lancaster

General had been overpaid, and that Plaintiffs and the Plaintiff Class had been underpaid, during Fiscal Year 2010. Similarly, the Auditor General did not publicly disclose this same information about Fiscal Year 2011 until after it released its audit report for that year on October 2, 2014, and it did not publicly disclose this same information about Fiscal Year 2012 until after it released its audit report for that year on April 15, 2015. Moreover, prior to the publication of the May 23, 2014 report on Fiscal Year 2010, the Department had not publicly disclosed that it would not require reallocation of overpayments made during Fiscal Years 2010 to 2012.

86.     Plaintiffs and the Plaintiff Class did not receive a copy of the Auditor General's report on Fiscal Year 2010 until sometime after May 23, 2014. Only after receiving that report did Plaintiffs and the Plaintiff Class become aware that they had been underpaid during Fiscal Year 2010 and that Lancaster General had been overpaid during Fiscal Year 2010.

87.     After issuance of the May 23, 2014 report for Fiscal Year 2010, Lancaster General did not publicly disavow its duty to disgorge itself of the ill-gotten gains it received as a consequence of its submission of invalid or overstated extraordinary expense claims. Moreover, Lancaster General did not renounce its decision to maintain the overpayments as reserves that are payable for future redistribution to the hospitals that were underpaid during those years.

88.     Plaintiffs have demanded that Defendants pay them their pro rata share of the amount by which Lancaster General was overpaid, and by which Plaintiffs were underpaid, but Defendants have rejected that demand.

89.     Although Lancaster General has previously recognized the impropriety of retaining overpayments, it has now retained about $9 million in overpayments that it received as a consequence of its submission of massive amounts of invalid or overstated extraordinary expense claims.

90.     In light of the foregoing facts, the causes of action alleged herein did not accrue and the injuries of Plaintiffs and the Plaintiff Class were not discoverable until after (a) the Auditor General publicly disclosed on or after May 23, 2014 that Lancaster General had been overpaid for Fiscal Year 2010 and that Plaintiffs and the Plaintiff Class had been underpaid for that Fiscal Year, (b) the Department decided sometime in 2016 that it would not require reallocation of overpayments, and (c) Lancaster General refused in 2017 to repay the money by which it had been overpaid.

91.     Plaintiffs and the Plaintiff Class were unaware of and could not despite the exercise of due diligence discover their injury until at least May 23, 2014, the release date for the Auditor General's report on Fiscal Year 2010.

92.     Defendants misled Plaintiffs and the Plaintiff Class into believing that Lancaster General had no intention of retaining any overpaid funds for Fiscal Years 2010 to 2012, and that Lancaster General would instead pay those funds back to Plaintiffs and the Plaintiff Class once the Auditor General completed its audit of the relevant fiscal year. Plaintiffs' and the Plaintiff Class's injuries were neither known nor reasonably knowable, notwithstanding their exercise of due diligence, until at least May 23, 2014. Indeed, given that Lancaster General had repaid its overpayments from Fiscal Years 2008 and 2009, and had further maintained future overpayments as a reserve, Plaintiffs and the Plaintiff Class had no immediately ascertainable injury when Defendants submitted the invalid claims and received overpayments for Fiscal Years 2010 through 2012. Moreover, Plaintiffs and the Plaintiff Class did not have access to, and thus could not even review, Lancaster General's extraordinary expense claims at the time they were submitted or since. Neither the injury nor its cause were reasonably ascertainable until after the 2014 release of the

31

Auditor General report on Fiscal Year 2010 and after Lancaster General refused in 2017 a demand to pay back the amounts by which it has been overpaid.

93.     Defendants fraudulently concealed their wrongdoing through numerous affirmative independent acts including but not limited to (a) repaying the amount of overpayments for Fiscal Years 2008 and 2009, which repayments were made on or about January 18, 2011 for Fiscal Year 2008 and January 18, 2012 for Fiscal Year 2009, (b) holding out to Plaintiffs and the Plaintiff Class that they would repay the money that they had been overpaid for Fiscal Years 2010 to 2012, (c) failing to disclose that they had been overpaid and that they would not repay those overpayments for those Fiscal Years, (d) failing to disclose to the public their extraordinary expense claims for Fiscal Years 2008 to 2012, and (e) holding their overpayments for Fiscal Years 2010 through 2012 on their books as payable for future redistribution to hospitals that were underpaid. Through Defendants' fraud, concealment, and deception, they caused Plaintiffs and the Plaintiff Class to relax their vigilance and deviate from their right of inquiry into the facts. Plaintiffs and the Plaintiff Class were thus unaware of their claims, notwithstanding their exercise of reasonable diligence, until Lancaster General refused in 2017 and 2018 to repay the money by which it had been overpaid.

94.     Plaintiffs and the Plaintiff Class were misled or relaxed in their investigation into possible causes of action by reasonably relying on the representations set forth above.

95.     Plaintiffs' and the Plaintiff Class's ignorance is not attributable to their lack of diligence in investigating possible claims, because Plaintiffs and the Plaintiff Class vigilantly reviewed the Auditor General overpayment reports, ensured that they were repaid the money that they were underpaid in Fiscal Years 2008 and 2009, reviewed the Auditor General's 2010 Fiscal

Year report as soon as it became available to them after May 23, 2014, and sought repayment from Defendants.

96.     Defendants are equitably estopped from arguing that the statute of limitations bars the claims of Plaintiffs and the Plaintiff Class because they induced Plaintiffs and the Plaintiff Class not to sue or discover their injuries earlier, and because Plaintiffs and the Plaintiff Class justifiably relied on that inducement.

97.     Plaintiffs' and the Plaintiff Class's claims did not accrue until 2017, and at a minimum did not accrue until May 23, 2014.

98.     Plaintiffs and the Plaintiff Class did not discover their injuries until 2017, and at a minimum they did not discovery their injuries until May 23, 2014.

99.     Defendants' fraudulent concealment lasted until 2017, and at a minimum until May 23, 2014.

100.    The statute of limitations was tolled until 2017, and at a minimum until May 23, 2014.

**Class Action Allegations.**

101.    The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this complaint on a common basis.

102.    Plaintiffs propose a single Class seeking damages, injunctive relief, and declaratory relief. The Class is defined as: All hospitals that participated in the Extraordinary Expense Program during Fiscal Year 2010, Fiscal Year 2011, and/or Fiscal Year 2012, and whose net receipts from the EE Program during those years was less than the share of EE Program funds they are entitled to under the Tobacco Settlement Act.

33

103.    A class action is a superior means, and the only practicable means, by which the named Plaintiffs and Plaintiff Class members can challenge the Defendants' unjust enrichment.

104.    The class is so numerous that joinder of all members is not practicable. There are more than 70 hospitals that are members of the Plaintiff Class.

105.    There are questions of law or fact that are common to the Plaintiff Class, and the relief sought is common to all members of the Plaintiff Class. Common legal and factual questions arise from Defendants' scheme to submit invalid, incorrect, and inflated extraordinary expense claims from 2010 through 2012. The resolution of these legal and factual questions will determine whether all members of the class are entitled to damages payable according to their pro rata share of the EE Program fund.

106.    The claims and defenses of the representative parties are typical of the claims and defenses of the Plaintiff Class. All Plaintiff Class members have the same claims, i.e., that the John Doe Defendants are liable under 18 U.S.C. § 1964, and that Lancaster General has been unjustly enriched, has improperly retained money had and received, and holds Plaintiffs' and the Plaintiff Class's money in a constructive trust, causing injury and damage to the class members. If the named Plaintiffs succeed on their claims, that ruling will likewise benefit every other member of the Plaintiff Class. Any defenses that the Defendants raise are also likely to be raised equally against all of the named Plaintiffs and the members of the Plaintiff Class.

107.    The representative parties will fairly and adequately assert and protect the interests of the Plaintiff Class.

108.    The attorneys for the representative parties will fairly and adequately represent the interests of the Plaintiff Class. The named Plaintiffs are represented by Cooper & Kirk, PLLC, and Webber McGill LLC, two law firms that together have considerable experience litigating class

34

action claims, and cases relating to false claims. These two law firms also have detailed knowledge of the Defendants' scheme and the applicable law, and they have done substantial work in identifying and investigating the potential claims in the action, already collectively spending significant time on this case to date. These two law firms have the resources necessary to represent the class, and they will commit those resources to this case.

109.    The representative parties do not have a conflict of interest in the maintenance of the class action, and they have or can acquire adequate financial resources to assure that the interests of the Plaintiff Class will not be harmed.

110.    A class action provides a fair and efficient method for adjudicating the controversy.

111.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The principal legal and factual question in this case—whether the John Doe Defendants are liable under 18 U.S.C. § 1964 and whether Lancaster General has unlawfully retained millions of dollars in overpayment that rightly belongs to Plaintiffs and the Plaintiff Class—is common to all Plaintiff Class members. Once that question is answered in the affirmative, all that will be required is the mechanical calculation of damages owed to each Plaintiff Class member. This calculation has already been performed by the Auditor General for each Plaintiff Class member in the Auditor General's public reports regarding overpayments in Fiscal Years 2010 through 2012. The Plaintiff Class members have little interest in individually controlling the prosecution of separate actions. There is no other litigation already commenced by or against members of the class involving any of the same issues. Moreover, it is desirable to concentrate the litigation of the claims in this particular forum. The injured class members are all

Pennsylvania hospitals, and the Eastern District of Pennsylvania is the home of the Defendants, is where the cause of action arose, and is where a transaction or occurrence took place out of which the cause of action arose. At least one class member resides in this District, at least one class member was underpaid and injured in this District, payment to at least one class member is owed and due in this District, and at least one class member submitted its extraordinary expense claims for which it was underpaid from this District. The size of the Plaintiff Class, and the minimal difficulties likely to be encountered in the management of the action as a class action, further support the conclusion that this case should be maintained as a class action. The Plaintiff Class includes more than 70 hospitals that were underpaid by as much as hundreds of thousands of dollars or as little as a few thousand dollars (or even less). Joinder of all 70+ hospitals would be impractical, as would the maintenance of more than 70 separate suits, each brought to resolve identical legal and factual questions. By contrast, there will be minimal difficulties in maintaining the action as a class action, including in terms of calculating damages. Finally, in view of the complexities of the issues or the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions. Many members of the Plaintiff Class have been undercompensated only by a few thousand dollars, or even less. For example, at least 20 members of the Plaintiff Class were underpaid by less than $10,000. The cost to bring litigation on behalf of those hospitals, and indeed on behalf of most or all of the hospitals, far exceeds the amount by which most if not all of the individual plaintiffs have been undercompensated.

112.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the Plaintiff Class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would

establish incompatible standards of conduct for Defendants. Maintaining more than 70 actions across the Commonwealth of Pennsylvania would run the risk of inconsistent rulings in those different cases, subjecting the Defendants to liability for their actions towards some plaintiffs, and no liability or a different amount of liability towards other plaintiffs.

113.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the Plaintiff Class would create a risk of adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. For example, if one member of the Plaintiff Class were to sue the Defendants and receive a monetary award that was inappropriately high, that would impair the other underpaid hospitals' ability to receive compensation for the full amount of their damages. Consideration of this case as a class action thus ensures a consistent scheme of recovery for all Plaintiffs and members of the Plaintiff Class.

114.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Defendants' submission of massive amounts of invalid, inaccurate, and inflated claims under the EE Program, and their refusal to repay their ill-gotten funds to Plaintiffs and the Plaintiff Class, are actions or refusals to act that have been equally taken towards all members of the Plaintiff Class. Accordingly, final equitable and declaratory relief is appropriate with respect to the entire Plaintiff Class.

37

## COUNTS

## COUNT ONE — VIOLATION OF 18 U.S.C. § 1962(c)

### Against John Doe 1 and John Doe 2

115.    Plaintiffs incorporate by reference the allegations in paragraphs 1–114.

116.    RICO creates a creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." John Doe 1 and John Doe 2 violated this provision of 18 U.S.C. § 1962.

117.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). Lancaster General Hospital is a legal entity and therefore qualifies as an enterprise.

118.    John Doe 1 and John Doe 2 both exercised discretion on behalf of Lancaster General Hospital by developing and submitting EE Program reimbursement requests. They therefore have a role in directing Lancaster General Hospital's affairs.

119.    Through the numerous acts of wire fraud detailed above, John Doe 1 and John Doe 2 conducted or participated in the conduct of the affairs of Lancaster General Hospital through a pattern of racketeering activity.

120.    Funding, goods, and services procured by Lancaster General Hospital have moved in interstate commerce, and Lancaster General Hospital treats patients from other states. Lancaster General Hospital's activities therefore affect interstate commerce.

121.    The racketeering activities of John Doe 1 and John Doe 2 directly and proximately injured the business and property of Plaintiffs and the Plaintiff Class. As an immediate and direct result of those racketeering activities, Plaintiffs and the Plaintiff Class received less than the amounts to which they were entitled under the EE Program during Fiscal Years 2010, 2011, and 2012.

### COUNT TWO — VIOLATION OF 18 U.S.C. § 1962(d)

#### Against John Doe 1 and John Doe 2

122.    Plaintiffs incorporate by reference the allegations in paragraphs 1–121.

123.    RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

124.    An "enterprise" for purposes of RICO "includes any . . . partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). Lancaster General Hospital is a legal entity and therefore qualifies as an enterprise.

125.    Funding, goods, and services procured by Lancaster General Hospital have moved in interstate commerce, and Lancaster General Hospital treats patients from other states. Lancaster General Hospital's activities therefore affect and affected interstate commerce.

126.    John Doe 1 and John Doe 2 are each associated with Lancaster General Hospital and agreed and conspired to engage in the pattern of wire fraud detailed above—a pattern of wire fraud that violated 18 U.S.C. § 1962(c). This conspiracy violated 18 U.S.C. § 1962(d).

127.    Through this agreed-upon pattern of racketeering activity, Plaintiffs and the Plaintiff Class were directly and proximately injured in their business and property. As an

immediate result of these racketeering activities, Plaintiffs and the Plaintiff Class received less than the amounts to which they were entitled under the EE Program during Fiscal Years 2010, 2011, and 2012.

## COUNT THREE — UNJUST ENRICHMENT

### Against Lancaster General Hospital, Lancaster General Health, the University of Pennsylvania Health System, and the Trustees of the University of Pennsylvania

128.    Plaintiffs incorporate by reference the allegations in paragraphs 1–127.

129.    Defendants Lancaster General Hospital, Lancaster General Health, the University of Pennsylvania Health System, and the Trustees of the University of Pennsylvania have been enriched and have received a benefit as a consequence of their submission of incorrect and overstated extraordinary expense requests, and as a consequence of their receipt, retention, and failure to pay back the amounts by which they have been overpaid.

130.    Plaintiffs, the Plaintiff Class, the Department, and Pennsylvania conferred a benefit upon Defendants.

131.    Defendants appreciated those benefits and accepted and retained those benefits under circumstances that would render it inequitable for Defendants to retain the benefits without payment to Plaintiffs and the Plaintiff Class.

132.    Plaintiffs and the Plaintiff Class were denied a benefit as a consequence of Defendants' actions.

133.    An injustice will result if Plaintiffs' and the Plaintiff Class's recovery from the enrichment is denied. Defendants have no legal or equitable entitlement to the money by which they have been overpaid, and in fact Plaintiffs and the Plaintiff Class have a legal and equitable entitlement to that money. Defendants were never and are not now entitled in equity or good conscience to be paid the millions of dollars by which they have been overpaid.