IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. LUKE'S HEALTH NETWORK, INC. d/b/a ST. LUKE'S UNIVERSITY HEALTH NETWORK, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 18-2157 |
| v. | |
| LANCASTER GENERAL HOSPITAL, et al., | |
| Defendants. | |

## MEMORANDUM

**SCHMEHL, J. /s/ JLS**                                          **SEPTEMBER 12, 2019**

The Racketeer Influenced & Corrupt Organization Act ("RICO"), enacted in 1970 as Title IX of the Organized Crime Control Act of 1970, and codified at 18 U.S.C. §§ 1961-1968, provides both criminal and civil remedies.  The case before us focuses solely on the civil remedies set forth in 18 U.S.C. § 1964(a), (b), and (c).  Plaintiffs St. Luke's Health Network, Inc., Saint Luke's Hospital of Bethlehem, Pennsylvania, St. Luke's Quakertown Hospital, Carbon-Schuylkill Community Hospital, and Blue Mountain Hospital ("Plaintiffs") allege that Defendants Lancaster General Hospital, Lancaster General Health, University of Pennsylvania Health System, Trustees of the University of Pennsylvania, John Doe 1, and John Doe 2 conspired to defraud the Tobacco Settlement Act's Extraordinary Expense Program which was created for hospitals in Pennsylvania providing charity care to its neediest citizens.  The issue is whether Plaintiffs can recover from Defendants under civil RICO.  Because the causal link between the the alleged predicate wrong and the harm is too attenuated, Plaintiffs have no civil RICO claim against

Defendants.  As the RICO claims against Defendants are dismissed, we also decline to exercise supplemental jurisdiction over Plaintiffs pendent state law claims.  Plaintiffs may refile in the appropriate state court.

## I.    FACTS ALLEGED

In 1998, Pennsylvania and 45 other states entered into a master settlement agreement which released certain cigarette manufacturers from specific claims for over 25 years.  (ECF Docket No. 1, ¶ 24.)  These funds were to be distributed to these states to cover the tobacco-related health care costs incurred following the settlement.  (Id.)  In 2001, the Pennsylvania General Assembly enacted the Tobacco Settlement Act, P.L. 755, No. 77, *as amended*, 35 Pa. Cons. Stat. § 5701.101 *et seq.* ("the Act"), which allocated the tobacco settlement funds to hospitals providing charity care to Pennsylvania's neediest citizens.  (Id. at ¶ 25.)  The Act established two programs to allocate the funds: (1) the Hospital Uncompensated Care Program ("the UC Program"); and (2) the Hospital Extraordinary Expenses Program ("the EE Program").  (Id. at ¶ 26.)  The UC Program compensates hospitals that meet certain statutory criteria, and the EE Program makes funds available to hospitals that do not receive funding under the UC Program.  (Id. at ¶¶ 27-28.)

As this case involves only the EE Program, we will focus on its procedures.  The EE Program reimburses hospitals that do not receive funding under the UC Program for "extraordinary expenses" incurred when they treat patients without health insurance.  (Id. at ¶ 28.)  "Extraordinary expenses" is defined as "the cost of hospital inpatient services provided to an uninsured patient which exceeds twice the hospital's average cost per stay for all patients."  (Id.) (citing 35 Pa. Cons. Stat. § 5701.1102.)  The Act also specifies how EE Program funds are distributed to participating hospitals, which shall equal the

lesser of: "(1) the hospital's extraordinary expenses or (2) the prorated amount of each hospital's percentage of extraordinary expense costs as compared to all eligible hospitals' extraordinary expense costs, as applied to the total funds available in the Hospital Extraordinary Expense Program for the fiscal year." (Id. at ¶ 29.) (citing 35 PA. CONS. STAT. § 5701.1105(d)). To apply for these funds, participating hospitals must submit their extraordinary expense data through an Internet portal to the Pennsylvania Health Care Cost Containment Council ("the PHC4 or "the Council"). (Id. at ¶ 30.) The claims are submitted on a quarterly basis and may be adjusted for accuracy 18 months after the final quarterly submission for a given fiscal year. (Id.) Under the Act, hospitals are prohibited from: submitting invalid or overstated extraordinary expense claims; being compensated for invalid or overstated extraordinary expense claims; and receiving more money from the EE Program than the hospital is entitled to receive. (Id. at ¶ 31.) The Act also restricts payments to participating hospitals exceeding the aggregate cost of services to patients with extraordinary expenses.[1] (Id.)

Overseeing the EE Program are the Pennsylvania Department of Human Services— formerly the Department of Public Welfare (collectively "the Department")—and the Pennsylvania Auditor General. (Id. at ¶ 32.) After a claim is submitted, the Department

---

[1] During Fiscal Years 2010 through 2012, the extraordinary expenses claims by participating hospitals exceeded the total funds available under the EE Program. (ECF Docket No. 1 at ¶ 34.) As the EE Program was "oversubscribed," if a participating hospital provided inflated or invalid claims, that hospital would receive a higher proportion of EE Program funds to the detriment of the other participating hospitals. (Id. at ¶ 35.) From Fiscal Years 2010 through 2012, the Department made $32.5 million worth of payments to Pennsylvania hospitals under the EE Program. (Id. at ¶ 36.) Specifically, in 2010, 70 hospitals participated in the EE Program: DHS paid $13.3 million worth of claims; 16 hospitals were overpaid a total of $5.6 million; and 54 hospitals were underpaid a total of $4.7 million. (Id. at ¶ 40.) In 2011, 68 hospitals participated in the EE Program: DHS paid $10.9 million worth of claims; 22 hospitals were overpaid a total of $2.8 million; and 46 hospitals were underpaid a total $1.9 million. (Id.) And in 2012, 66 hospitals participated in the EE Program: DHS paid $8.5 million worth of claims; 18 hospitals were overpaid a total of $2.1 million; and 48 hospitals were underpaid a total of $2.1 million. (Id.)

allocates the EE Program funds and the Auditor General then reviews the accuracy of the claims and allocations. (Id.) In some past fiscal years, the Department has used the results of the Auditor General's report to claw back and redistribute funds that were incorrectly overpaid to participating hospitals. (Id.) However, the Department ended this practice in 2014. (Id. at 83.) In May 2014, the Auditor General's report on Fiscal Year 2010 announced that the Department would no longer require hospitals that were overpaid during Fiscal Years 2010 to 2012 to pay back the overpayments for reallocation to hospitals that were underpaid. (Id.) While the Auditor General made this announcement, the Department did not definitively decide that it would not require such reallocations until around 2016. (Id.) As the Auditor General conducted audits several years after funds were initially distributed to the requesting hospitals, many hospitals were unaware of the underpayments or overpayments. (Id. at ¶ 84.) For example, hospitals that were overpaid in Fiscal Year 2008 were not required to pay back the overpayments until January 2011, and hospitals that were overpaid in Fiscal Year 2009 were not required to pay back the overpayments until June 2012. (Id.) Given the latency period between hospitals' extraordinary expense claims, the Auditor General's report, and the requirement the hospitals pay back the overpayments, hospitals were unaware "whether they were underpaid or overpaid, and whether other hospitals including Lancaster General Hospital were overpaid, in any given Fiscal Year until after the release of the audit report for the particular Fiscal Year." (Id.)

After the May 2014 report discontinuing the Department's claw back procedures, Plaintiffs "demanded that Defendants pay them their pro rata share of the amount by which Lancaster General was overpaid, and by which Plaintiffs were underpaid." Defendants

rejected this request.  (Id. at ¶¶ 87-88.)  Yet, according to Plaintiffs, Defendants misled Plaintiffs "into believing that Lancaster General had no intention of retaining any overpaid funds for Fiscal Years 2010 to 2012, and that Lancaster General would instead pay those funds back to Plaintiffs and the Plaintiff Class once the Auditor General completed its audit of the relevant fiscal year."  (Id. at ¶ 92.)  Defendants allegedly caused Plaintiffs and the Plaintiff Class to "relax their vigilance and deviate from their right of inquiry into the facts," which caused them to be "unaware of their claims, notwithstanding their exercise of reasonable diligence, until Lancaster General refused in 2017 and 2018 to repay the money by which it had been overpaid."  (Id. at ¶ 93.)

According to Plaintiffs, Defendants submitted "massively inflated extraordinary expense claims," which unjustly enriched Lancaster General by about $9 million for Fiscal Years 2010 through 2012.  (Id. at ¶ 41.)  As early as 2008, Plaintiffs allege John Doe 1, an employee at Lancaster General, "developed a plan whereby the hospital would pad the claims it submitted to the Commonwealth through the PHC4 Internet portal and thereby secure for Lancaster General more than its lawful funding under the EE Program."  (Id. at ¶ 43.)  More specifically, "John Doe 1 instructed John Doe 2—another Lancaster General employee—to prepare and submit through the PHC4 portal materials purporting to show that, during Fiscal Year 2008, Lancaster General Hospital was entitled to $2.8 million under the EE Program."  (Id.)  And Plaintiffs allege more specifically, "John Doe 1 and John Doe 2 knew that the Fiscal Year 2008 submissions were false, and each transmission of information over the Internet through the PHC4 portal for Fiscal Year 2008 constituted a separate act of wire fraud."  (Id.)

Plaintiffs maintain that John Doe 1 and John Doe 2 engaged in a years-long practice of submitting invalid and overinflated EE Program claims to the Commonwealth. (Id. at ¶ 53.) From Fiscal Years 2010 through 2012, Lancaster General Hospital submitted a total of 596 claims. According to Plaintiffs, 456 of those claims were rejected as invalid by the Auditor General. (Id. at ¶ 54.) "The circumstances surrounding Lancaster General's EE Program reimbursement requests make plain that John Doe 1 and John Doe 2 knew that they were making false representations." (Id. at ¶ 55.) Specifically, the Plaintiffs also allege the "aim of this scheme was to defraud the Department, the Auditor General, the PHC4, the citizens of Pennsylvania, and Plaintiffs and the Plaintiff Class—i.e., the dozens of law-abiding hospitals that provide care to Pennsylvania's neediest citizens." (Id. at ¶ 56.)

## II.  <u>STANDARD OF REVIEW</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679); *see also Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).

In our analysis of a motion to dismiss, the Court of Appeals allows us to also consider documents "attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III.   <u>ANALYSIS</u>

The Racketeer Influenced and Corrupt Organizations Act ("RICO") prohibits certain conduct involving a "pattern of racketeering activity." 18 U.S.C. § 1962. The statute requires proof of the existence of a RICO enterprise and defendants engaging in a pattern of racketeering activity known as "predicate acts." *Gates v. Ernst & Young*, 1994 WL 444709, at *1 (E.D. Pa. 1994). Although Title 18 of the U.S. Code does not typically

provide for a private right of action, one of RICO's enforcement mechanisms grants a private right of action to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions under 18 U.S.C. § 1964(c).[2] *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). A private right of action under § 1964(c) exists "if the alleged RICO violation was the proximate cause of the plaintiff injury." *Anza*, 547 U.S. at 453 (citing *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992).

As Defendants contend that Plaintiffs lack standing because the alleged RICO violation was not the proximate cause of the injury, we must determine whether Defendants' conduct was a proximate of Plaintiffs' injury. As explained below, because Defendants' conduct did not lead directly to Plaintiffs' injuries, no proximate cause exists, and Plaintiffs have no standing under civil RICO.

### A. Civil RICO Standing Under 18 U.S.C. § 1962

Under 18 U.S.C. § 1962(c), a civil cause of action exists for persons injured "by reason of" a defendant's RICO violation. *Anza*, 547 U.S. at 456 (citing *Holmes*, 503 U.S. at 265-66). An injury "by reason of" a RICO violation requires the plaintiff show "that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (citing *Holmes*, 503 U.S. at 268). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged"; a link that is "too remote," "purely

---

[2] "The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., makes it unlawful 'to ... invest' in an enterprise income derived from a pattern of racketeering activity, § 1962(a), 'to acquire or maintain' an interest in an enterprise through a pattern of racketeering activity, § 1962(b), 'to conduct or participate ... in the conduct' of an enterprise through a pattern of racketeering activity, § 1962(c), or 'to conspire' to violate any of those provisions, § 1962(d)." *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090, 2112 (2016).

contingent," or "indirect" is insufficient to establish proximate cause. *Id.* at 9. Specifically, a direct causal connection between the predicate wrong and the harm is required to show proximate cause under civil RICO. And while the concepts of direct relationship and foreseeability are "two of the 'many shapes [proximate cause] took at common law' . . . [the Supreme Court's] precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and harm." *Hemi Group, LLC*, 559 U.S. at 12.

Section 1964(c), modeled after the civil-action provision of the federal antitrust laws, specifically § 4 of the Clayton Act, requires some direct relationship between the injury asserted and injurious conduct alleged. As the Supreme Court stated, "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Holmes*, 503 U.S. at 271 (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 533 (1983)). And this "general tendency," confirmed in a line of Supreme Court cases, "applies with full force to proximate cause inquiries under RICO." *Hemi Group, LLC,* 559 U.S. at 10; *see also Holmes*, 503 U.S. at 271; *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 657-59 (2008); *Anza*, 547 U.S. 451, 460-61. Requiring some direct relationship between the injury asserted and injurious conduct alleged serves RICO's remedial purpose because "[a]llowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.'" *Holmes*, 503 U.S. at 274 (citing *Associated General Contractors*, 459 U.S. at 545). This requirement of a direct causal relation, as explained in *Holmes*, serves vital considerations of judicial administrability and

convenience. *Id.* at 268-69. Specifically, the Court stated in *Holmes*: (1) a less direct injury makes it more difficult to ascertain the "amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"; (2) recognizing indirect claims would force courts to adopt complicated rules "apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and (3) directly injured plaintiffs can generally be counted on to "vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269 (citing *Associated General Contractors*, 459 U.S. at 542-44; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 473–475 (1982); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972); *Associated General Contractors*, 459 U.S. at 541-42).

As case law reveals, civil RICO's direct relationship requirement necessitates dismissal—even at the pleading stage—where substantial intervening factors attenuate the causal connection between a defendant's conduct and a plaintiff's injury. First, in *Holmes v. Securities Investor Protection Corporation*, the Supreme Court concluded that a plaintiff may sue under § 1964(c) "only if the alleged RICO violation was the proximate cause of the plaintiff's injury." *Holmes*, 503 U.S. at 268. That is, the statute provides a civil cause of action to persons injured "by reason of" a defendant's RICO violation. *Id.* at 266. In *Holmes*, the Securities Investor Protection Corporation ("SIPC")—a private corporation with a duty to reimburse customers of registered broker-dealers—filed a civil RICO claim after it became unable to meet its financial obligations. *Id.* at 262. SIPC claimed the petitioner conspired to manipulate stock prices, and when the stock prices plummeted, two broker dealers were forced to liquidate, triggering SIPC's advance of "nearly $13 million

to cover their customers' claims." *Id.* at 263. SIPC sued alleging the petitioner participated in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of § 1962(c). *Id.* Applying the common-law foundations of proximate cause, the Court concluded that even if SIPC could stand in the shoes of non-purchasing and aggrieved customers, the RICO claims could not satisfy the directness requirement as "the link [was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers." *Id.* at 271. By concluding that the conspirators' conduct did not proximately cause the non-purchasing customers' injury because the conduct directly causing the harm was distinct from the conduct giving rise to the fraud, the Court refused to go "beyond the first step" for RICO liability.

Second, in *Anza v. Ideal Steel Supply Corp.*, the Supreme Court concluded that petitioner's § 1962(c) claim did not satisfy the proximate cause requirement because the alleged violation did not lead to the petitioner's injury. *Anza*, 547 U.S. at 461. In *Anza*, Ideal Steel Supply ("Ideal") alleged RICO violations against its competitor, National Steel Supply ("National")—owned by the petitioner's Joseph and Vincent Anza—claiming National "adopted a practice of failing to charge the requisite New York sales tax to cash-paying customers, even when conducting transactions that were not exempt from sales tax under state law." *Id.* at 454. This, according to Ideal, allowed National to undercut Ideal's prices because the lower prices offered by National allowed it to attract customers at Ideal's expense which gave National a competitive advantage over Ideal. *Id.* at 458. Based on this theory, the Court determined that the direct victim was the State of New York—not Ideal—as National *defrauded the State* which lost the tax revenue as a result. *Id.* (emphasis

added). The Court stated, "[t]he cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* Incorporating the "fundamental concerns expressed in *Holmes*," the Court looked to the "speculative nature of the proceedings" if Ideal were permitted to maintain its claim. The Court also reasoned that the State of New York was the better situated plaintiff as it "can be expected to pursue appropriate remedies." *Id.* at 459-60.

Third, in *Hemi Group, LLC v. City of New York, N.Y.*, the Supreme Court found that no RICO claim existed because the injuries suffered were not caused directly by the alleged fraud and were therefore not caused "by reason of" a RICO violation. *Hemi Group, LLC*, 559 U.S. at 18. In *Hemi Group, LLC*, the City of New York filed a RICO claim against an out-of-state vendor of cigarettes—Hemi Group—alleging Hemi failed to file customer information with the state as required by federal law for out-of-state vendors which caused the City of New York "to lose tens of millions of dollars in unrecovered cigarette taxes." *Id.* at 4. Though the City of New York taxes the possession of cigarettes, neither state nor city law requires Hemi to "charge, collect, or remit the tax"; instead, federal law requires out-of-state vendors to submit customer information to States where its cigarettes are shipped. *Id.* While recovering this information is challenging—given the customers' reluctance to pay taxes on cigarettes—the City may recover the back taxes through the Jenkins Act. The Jenkins Act requires out-of-state cigarette vendors to register and file a report with state tobacco tax administrators identifying the name, address, and quantity of cigarettes purchased by state residents. *Id.* at 5. New York State and the City agreed to "cooperate fully with each other and keep each other fully and promptly informed with reference to any person or transaction subject to both State and City cigarette taxes."

The State, according to the City, would then forward Jenkins Act information to the City to help track down purchasers who do not pay their taxes. *Id.* at 5-6. Hemi Group, an out-of-state company that sold cigarettes online, "[did] not file Jenkins Act information with the State," which the City argued "costs it 'tens if not hundreds of millions of dollars a year in cigarette excise tax revenue.'" *Id.* at 6. And so, given Hemi's failure to file Jenkins Act information *with the state*, the City sued Hemi Group alleging RICO violations. *Id.* (emphasis added). Following *Holmes* and its progeny, the Supreme Court in *Hemi Group, LLC* refused to go beyond the first step of proximate cause and required a direct relationship between the conduct and harm to establish RICO liability. *Id.* at 11. The Court stated:

> The City's causal theory is far more attenuated than the one we rejected in *Holmes*. According to the City, Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected.

*Id.* at 9. The Court found that the conduct directly responsible for the City's injury was the customers' failure to pay their taxes and the conduct creating the alleged fraud was Hemi's failure to submit Jenkins Act reports. *Id.* at 11. And so, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud. *Id.* The Court, distinguishing *Hemi Group, LLC* from *Anza*, stated that the City's theory of liability rested on "not just separate actions, but separate actions carried out by separate parties." Specifically, the Court concluded, "Hemi's obligation was to *file the Jenkins Act reports with the State, not the City*, and the City's harm was directly caused by the customers, not Hemi. We have

never before stretched the causal chain of a RICO violation so far, and we decline to do so today." *Id.* (emphasis added).

And finally, in *Bridge v. Phoenix Bond & Indem. Co.*, the Supreme Court reaffirmed that there must be a direct relationship between the defendant's alleged conduct and the plaintiff's injury. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). *Bridge* involved competing bidders at a county tax-lien auction where the involved "percentage penalties the property owner [would] pay the winning bidder in order to clear the lien," and the bidder willing to accept the lowest penalty typically won the auction. *Id.* at 642. As the lowest percentage was usually 0%, the liens were allocated "on a rotational basis" to ensure the liens were apportioned fairly among 0% bidders. *Id.* at 643. But this created a perverse incentive where bidders, in addition to bidding themselves, sent agents to bid on their behalf to obtain a disproportionate share of the liens. *Id.*

To prevent this, the county created the "Single, Simultaneous Bidder Rule" which required each "'tax buying entity' to submit bids in its own name and prohibits it from using 'apparent agents, employees, or related entities' to submit simultaneous bids for the same parcel." *Id.* A losing bidder brought a RICO claim alleging the winning bidder violated the "Single, Simultaneous Bidder Rule" by colluding with other firms to bid on the same properties at 0%, "allowing them to acquire a greater number of liens than would have been granted to a single bidder alone," and then purchase the liens and transfer the certificates of purchase to the eventual winning bidder. *Id.* at 644. The Court concluded that the losing bidder's claim satisfied RICO's causation requirement because "there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no

more immediate victim is better situated to sue." *Id.* at 658. As the Court in *Hemi Group, LLC* would explain: "the plaintiff's theory of causation in *Bridge* was "straightforward": because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over." *Hemi Group, LLC*, 559 U.S. at 14. As such, the defendants' actions were found to have directly caused the plaintiffs' injuries and the losing bidders had standing to pursue a civil RICO claim in federal court.

B. <u>Plaintiffs Fail to Plead Proximate Cause Under Civil RICO.</u>

Plaintiffs are unable to satisfy civil RICO's pleading requirement because the events pleaded do not allege a direct relationship between Defendants' conduct and Plaintiffs' injuries. Plaintiff's theory of causation here, unlike *Bridge*, is anything but straightforward. As Defendants correctly argue, Plaintiffs' alleged injuries occurred when DHS changed its policy to discontinue the claw-back and redistribution procedure, not when Defendants allegedly committed the violative acts. (ECF Docket No. 2, at 28.)

As addressed above, the Pennsylvania General Assembly enacted the Tobacco Settlement Act ("the Act") to allocate funds received from the settlement agreement with some of the nation's largest cigarette manufacturers. (ECF Docket No. 1, ¶¶ 24-25.) Under the Act, "Pennsylvanians decided to allocate the Commonwealth's Tobacco Settlement Fund to hospitals that provide charity care." (Id. at ¶ 25.) To properly disburse these funds, two programs were created: 1) the Hospital Uncompensated Care Program ("the UC Program"); and 2) the Hospital Extraordinary Expenses Program ("the EE Program"). (Id. at ¶ 26.) The EE Program reimbursed hospitals for "extraordinary expenses" incurred when treating patients without health insurance. (Id. at ¶ 28.) Specifically, the Act

distributed payments to participating hospitals equaling the lesser of: "(1) the hospital's extraordinary expenses or (2) the prorated amount of each hospital's percentage of extraordinary expense costs as compared to all eligible hospitals' extraordinary expense costs, as applied to the total funds available in the Hospital Extraordinary Expense Program for the fiscal year." (Id. at ¶ 29.) Submitting extraordinary expenses required the hospitals request relief through an Internet Portal to the Pennsylvania Health Care Cost Containment Council ("the PHC4" or "the Council"). (Id. at ¶ 30.) Though the claims were submitted on a quarterly basis, hospitals could adjust the claim for accuracy "about 18 months after their final quarterly submission for a given fiscal year." (Id.)

Importantly, the EE Program is managed by the Pennsylvania Department of Human Services, formerly the Department of Public Welfare, and by the Pennsylvania Auditor General. (Id. at ¶ 32.) The Department was responsible for the administration of the EE Program, collecting data necessary to administer the EE Program—including but not limited to data from the Council, and the authority to contact relevant data sources if data was missing or if there were a need to obtain any other necessary information. Following a hospital's EE Program claim, the Department would allocate funds under the EE Program which was then reviewed by the Auditor General to determine the accuracy of the allocations. (Id.) If the Auditor General's report determined allocations were inaccurate, the Department would claw back and redistribute funds that were incorrectly overpaid. (Id.)

From Fiscal Year 2010 to Fiscal Year 2012, each hospital received a pro-rata share of the total fund as the EE Program was "oversubscribed." (Id. at ¶ 71.) During this time and based on the Auditor General's report reviewing the accuracy of claims, the

Department would claw back the overpayments and reallocate the money to the underpaid hospitals. (Id. at ¶ 83.) The Auditor General typically conducted a review of the claims several years after the funds were distributed to the requesting hospital. (Id. at ¶ 84.) So, repayments for the 2008 Fiscal Year were not "clawed back" by the Department until January 2011; and the repayments for the 2009 Fiscal Year were not "clawed back" until June 2012. (Id.) Each year Plaintiffs were unaware of the status of all underpayments and overpayments until the Auditor General's audit report for a specific Fiscal Year. (Id.) And so, Plaintiffs were unaware the Department would not claw back the overpayments for the Fiscal Years 2010 to 2012 until the Auditor General's report on May 23, 2014, when the Department changed its policy and would no longer "require hospitals that had been overpaid during Fiscal Years 2010 to 2012 to pay back their overpayments for reallocation to hospitals that had been underpaid." (Id.) And, "the Department did not definitively decide that it would not require such reallocations until sometime in 2016." (Id.)

According to Plaintiffs, Defendants John Doe 1 and John Doe 2 "massively inflated extraordinary expense claims" to the detriment of other hospitals that entered accurate extraordinary expense claims, which allowed Defendants to receive an unjustly high proportion of EE program funds. (Id. at ¶¶ 35, 41.) Specifically, Plaintiffs allege Defendants submitted a total of 596 claims under the EE Program from Fiscal Year 2010 through Fiscal Year 2012. (Id. at ¶ 54.) According to Plaintiffs, 456 claims were rejected as invalid by the Auditor General. (Id.) The goal of the scheme, Plaintiffs contend, was to defraud the Department, the Auditor General, the PHC4, the citizens of Pennsylvania, and "the dozens of law-abiding hospitals that provide care to Pennsylvania's neediest citizens." (Id. at ¶ 56.) Defendants benefited from this alleged fraud from Fiscal Year 2010 through

2012 because they were paid about $12.4 million when they should have been paid only about $3.6 million.  (Id. at ¶ 57.)

Like in *Holmes* and the subsequent cases, Plaintiffs are unable to show a direct causal connection between the predicate wrong and the harm suffered as there are multiple intervening acts attenuating the link between Plaintiffs' alleged injury and Defendants' alleged injurious conduct.  While Plaintiffs may allege the predicate RICO offenses were the "but for" cause of injury, Plaintiffs fail to show that the RICO predicate offenses were the "proximate cause" of injury as the link between the injury asserted and injurious conduct alleged is too remote and indirect.  First, each hospital may submit extraordinary expense claims for charity services offered. Once a claim is submitted, the Department—which oversees the EE Program—determines the reimbursement amount for each hospital. Then following the disbursement of funds, the Auditor General—several years later—conducts an audit on the accuracy of claims and issues a report to the Department detailing which hospitals were incorrectly underpaid or overpaid.  And finally using the Auditor General's report, the Department would claw back and redistribute funds that were incorrectly overpaid to hospitals.  But, in 2014, the Department discontinued this practice and no longer required hospitals to return the overpaid money.  Participating hospitals were ostensibly permitted to keep the funds disbursed by the Department for those given years.

These facts alone create a link that is far too remote from the alleged injurious harm suffered by Plaintiffs.  Like *Anza*, where the alleged violation had not "led directly to the plaintiff's injuries," Plaintiffs here fail to meet RICO's requirement of a direct causal connection between the predicate offenses (mail and wire fraud) and the alleged harm. Defendants John Doe 1 and John Doe 2's alleged violations did not lead directly to

Plaintiffs' injuries. And like *Hemi Group LLC*, where the conduct directly responsible for the City's harm was the customer's failure to pay their taxes and the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports, here, the conduct directly responsible for Plaintiffs' harm was the Department's decision to discontinue its claw back and redistribution process, and the conduct constituting the alleged fraud was John Doe 1 and John Doe 2 allegedly submitting overinflated claims. As argued by Defendants, "there is no direct causation because DHS was an intermediary between the parties and exercised discretion in the distribution of [the settlement] funds." (ECF Docket No. 20, at 28.) Because Plaintiffs theory of causation requires us to "go beyond the first step" breaking the causal chain under RICO, Plaintiffs cannot meet RICO's direct relationship requirement and lack standing to bring RICO claims against Defendants.

Besides, policy considerations also weigh against extending the causal link required in this case as the Department is the "better situated plaintiff" that can "generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured remotely." *Anza*, 547 U.S. at 460 (citing *Holmes*, 503 U.S. at 269-70). Here, the Department is the one most directly harmed by Defendants' alleged RICO activities and could have, as argued by Defendants, "assess[ed] administrative penalties [against Lancaster General] for submitting overinflated claims." (ECF Docket No. 20, at 30) (citing 35 P.S. § 5701.1108.) The Department refused to assess any penalties against Defendants even after Defendants allegedly overinflated the claims made to the Department. (Id. at 30.)

Plaintiffs also reference the Auditor General's reports to show that the damages attributable to the RICO violations are already calculated. Although the Auditor General

reviewed the accuracy of the allocations which allowed the Department "during some past fiscal years" to claw back and redistribute funds that were allegedly incorrectly overpaid to Defendants, the Department determined in 2014 that the Auditor General's report contained numerous errors as the Auditor General improperly considered claim and expense data that was not submitted to the PHC4 website.  (Id. at 9.)  Specifically, the Department stated:

> [DHS] disagrees with the payment discrepancies identified by the AG. The AG used certain information in their review that was not available to [DHS] at the time the extraordinary expense eligibility and payment amounts were calculated. *In fact, the information used by the AG included claims that had not even been submitted by hospitals for consideration as an extraordinary expense claim at the time [DHS] calculated these payments.*

(Id. at 9-10) (citing AG's Exhibit A Report at 28) (emphasis added).  Even though the Auditor General reviewed the accuracy of the claims, the Department took issue with the way the Auditor General reviewed the claims.  Given this discrepancy, we would be required to adopt complicated rules apportioning damages among Plaintiffs removed at different levels of injury from the alleged violative acts.  Merely reviewing the Auditor General's report—used during some past fiscal years—would create confusion when tasked with apportioning damages between the direct and indirect Plaintiffs in this case.

Therefore, because there is no direct causal connection between the Defendants' predicate wrong and Plaintiffs' harm, and given the speculative nature of the proceedings regarding calculation of damages for the indirect injuries suffered, we conclude that Plaintiffs lack standing to raise a civil RICO claim against Defendants in federal court.

C. <u>We Decline to Exercise Supplemental Jurisdiction Over Remaining State Law Claims.</u>

Under 28 U.S.C. § 1331, district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331. And unless otherwise provided in 28 U.S.C. § 1367(b) and (c), or expressly provided otherwise by Federal statute, district courts shall "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. But district courts may decline to exercise this supplemental jurisdiction over a claim under 28 U.S.C. § 1367(a) if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Specifically, "federal courts *shall* exercise supplemental jurisdiction over pendent claims arising out of the same case or controversy and *may* decline to exercise jurisdiction if all federal claims are dismissed." *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 225 n.6 (3d Cir. 1995) (quoting *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277 (3d Cir. 1993)).

As the Supreme Court explained in *United Mine Workers of America v. Gibbs*, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966). The district court's decision to exercise jurisdiction over supplemental state law claims is discretionary despite its subject-matter jurisdiction over the state law claims. In deciding whether to exercise supplemental jurisdiction, courts should "take into account generally accepted principles of 'judicial

economy, convenience, and fairness to the litigants." *Fralin v. County of Bucks*, 296 F.Supp.2d 609, 617 (E.D. Pa. 2003) (quoting *Growth Horizons*, 983 F.2d at 1284).

Because we determined Plaintiffs do not have standing to sue under federal RICO statutes, and given the absence of a direct relationship between Defendants' alleged conduct and Plaintiffs' injury, we decline to exercise supplemental jurisdiction over Plaintiffs pendent state law claims. While we have the right to exercise jurisdiction over Plaintiffs' state claims, we decline to do so based on the generally accepted principles of fairness, judicial economy, and convenience. Given the stage of these proceedings and lack of prejudice to Plaintiffs, the remaining state law claims are better situated in state court. Plaintiffs may refile the state law claims in the appropriate state court.[3]

## IV.   CONCLUSION

In the accompanying order, we grant Defendants' Motion to Dismiss in part as Plaintiffs fail to plead a plausible right to relief under federal civil RICO. Because Plaintiffs fail to show a direct causal connection between the predicate wrong and the harm, Plaintiffs have no federal RICO claim. As the RICO claims against Defendants are dismissed, we also decline to exercise supplemental jurisdiction over Plaintiffs' pendent state law claims. Accordingly, the case is dismissed without prejudice and Plaintiffs may refile in the appropriate state court.

---

[3] The Commonwealth of Pennsylvania provides analogous civil remedies under state law, including "making due provision for the rights of innocent persons. . ."  18 PA. CONS. STAT. § 911(d)(ii).