IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ST. LUKE'S HEALTH NETWORK, INC. d/b/a ST. LUKE'S UNIVERSITY HEALTH NETWORK, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 18-2157 |
| v. | |
| LANCASTER GENERAL HOSPITAL, et al., | |
| Defendants. | |

**MEMORANDUM OPINION**

**SCHMEHL, J. /s/ JLS**                                                                                    October 12, 2021

    This case involves a group of Pennsylvania hospitals and their health care networks alleging that Lancaster General Hospital, its related health care networks, and two John Doe executive employees conducted a racketeering fraud scheme. Plaintiffs allege that Lancaster General Hospital submitted invalid and inflated health care claims to the Commonwealth of Pennsylvania so that it would receive large sums of monies from the Tobacco Settlement Act. Plaintiffs claim that Lancaster General Hospital received $19.4 million during fiscal years 2008-2012 from the total sum of $55.9 million which was made available to seventy participating hospitals.

    This Court originally granted defendants' Motion to Dismiss after finding a lack of proximate causation, but the Third Circuit reversed that decision. Now, defendants filed an Amended Motion to Dismiss where they argue that plaintiffs do not state a plausible claim for relief as their conduct was entirely legal. Defendants' Amended Motion to Dismiss is denied because plaintiffs have adequately pled a racketeering fraud scheme at this pleading stage.

I. **Background**

    1. <u>Factual Background</u>[1]

In 1998, Pennsylvania and forty-five other states entered into a master settlement agreement with certain cigarette manufacturers. As part of the settlement, the cigarette manufacturers disbursed funding to the states to cover tobacco-related health care costs. To allocate the funds to hospitals providing care to indigent patients, the Pennsylvania General Assembly enacted the Tobacco Settlement Act in 2001, and the Extraordinary Expense Program (the "EE Program"). P.L. 755, No. 77 (codified at 35 Pa. Stat. § 5701.101 *et seq.* (2001)).

The EE Program reimburses participating hospitals for "extraordinary expenses" incurred for treating uninsured patients. "Extraordinary expenses" are "[t]he cost of hospital inpatient services provided to an uninsured patient which exceeds twice the hospital's average cost per stay for all patients." § 5701.1102. The amount hospitals receive is the lessor of "(1) the extraordinary expense claim; or (2) the prorated amount of each hospital's percentage of extraordinary expense costs as compared to all eligible hospitals' extraordinary expense costs, as applied to the total funds available in the Hospital Extraordinary Expense Program for the fiscal year." § 5701.1105(d). The latter recognizes that funds available through this program may not cover all extraordinary expenses that would be eligible for reimbursement in a fiscal year. So, in fiscal years when the program does not have enough money to cover all extraordinary expenses of each participating hospital, the funds are distributed proportionally based on each hospital's share of reported extraordinary expenses.

The Department of Human Services (DHS) administers the EE Program. § 5701.1105(b). This includes the responsibility to determine the eligibility of each hospital for payment under

---

[1] A large portion of the Factual Background is derived from the Third Circuit's opinion.

the EE Program based on certain requirements under the Act. Participating hospitals submitted eligibility information and unpaid claims through the Pennsylvania Health Care Cost Containment Council's (PHC4) website portal on a quarterly basis. DHS then calculates and makes EE Program payments to qualifying hospitals on an annual basis. § 5701.1105(b)(5).

The Pennsylvania Auditor General was tasked with auditing the EE Program, and for fiscal years 2008-2012 the Auditor found that some hospitals received disbursements for unqualified claims (the "Auditor's Report").[2] The Auditor recommended to DHS that it claw back overpayments made to hospitals. DHS did so for years prior to 2010, but then determined that this claw back mechanism was not supported by the governing statute and discontinued asking hospitals to return unqualified or invalid disbursements. Thus, for fiscal years 2010-2012, DHS did not administer a claw back mechanism, and the hospitals who were overpaid retained such overpayments.

Plaintiffs are a group of hospitals and their related health care networks suing on behalf of all hospitals participating in the EE Program that the Auditor deemed underpaid during Fiscal Years 2010-2012. Plaintiffs claim that Lancaster General Hospital conspired to defraud the Tobacco Settlement Act's EE Program by submitting inflated and invalid claims which resulted in them receiving a large sum of overpayments in violation of civil RICO, and various state laws.

According to plaintiffs and the Auditor's Report, for fiscal year 2008, the EE Program had $11,500,000 available, Lancaster General received $2,800,000, but should have only received $1,100,000. For fiscal year 2009, the EE Program had $11,700,000 available, Lancaster General received $4,200,000, but should have only received $1,300,000. For fiscal year 2010,

---

[2] The references to fiscal years refers to years in which the hospitals received disbursements from the EE Program. The actual services for those years were rendered approximately a year or a year-and-a-half prior. These are the same fiscal years that the Auditor's and DHS's reports refer to.

3

the EE Program had $13,300,000, Lancaster General received $6,200,000, but should have only received $1,200,000. For fiscal year 2011, the EE Program had $10,900,000 available, Lancaster General received $3,600,000, but should have only received $1,200,000. For fiscal year 2012, the EE Program had $8,500,000, Lancaster General received $2,600,000, but should have only received $2,300,000. Lastly, for fiscal year 2013, while the parties do not state how much the EE Program had available that year, plaintiffs state that Lancaster General received $488,100, but should have received $863,957 because Lancaster General "apparently stopped their practice of submitting massive amounts of invalid or inflated claims. . . ." (ECF #1, ¶ 62.)

For 2008 and 2009, DHS clawed back overpayments made to Lancaster General pursuant to the Auditor's report, and presumedly disbursed the clawed back monies to underpaid hospitals. Lancaster paid back $1,700,000 in 2008, and $2,900,000 in 2009. But for the fiscal years of 2010, 2011, and 2012, DHS declined to claw back any disbursements for various reasons set forth in their Report, and hospitals such as Lancaster General retained all of these overpayments. Therein lies plaintiffs' gripe.

Plaintiffs complain that Lancaster General has retained a large sum of disbursements which unjustly enriched them, injured plaintiffs, and it occurred because of John Doe 1 and Joe Doe 2's racketeering fraud scheme which had the goal of increasing Lancaster's EE disbursements and defrauding the Commonwealth of Pennsylvania and other hospitals. Presently, defendants filed an Amended Motion to Dismiss where they argue that the Complaint does not state a plausible claim that entitles them to relief.

2. Procedural History

This Court originally granted defendants' Motion to Dismiss by holding that "the causal link between the alleged predicate wrong and the harm is too attenuated." (ECF #28.) The

4

reasoning for that decision was that DHS's decision to discontinue the claw back mechanism was found to have caused plaintiffs' injuries, not when defendants allegedly committed violative acts. However, the Third Circuit reversed that decision by holding that the "EE Program has a fixed pool of assets, Defendants' alleged manipulation to increase their share of the limited funding necessarily resulted in Plaintiffs receiving a decreased proportion of those assets." *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 302 (3d Cir. 2020). The Third Circuit also explicitly left open questions on defendants' first Motion to Dismiss which the Court addresses below.

II. **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the

assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679); *see also Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).

In our analysis of a motion to dismiss, the Court of Appeals allows us to also consider documents "attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

Here, defendants argue that the DHS Report and its contents can be considered on this Amended Motion to Dismiss stage under the 'public records' exception, and in their Reply Brief, they argue for the first time that the DHS Report may be considered under the 'integral documents' exception. (ECF #41-1, at 6 n.15; ECF #47, at 1-3.)

Under the public records exception, a court may take judicial notice of documents such as an administrative or legislative report, but such notice serves only to "indicate what was in the public realm at the time, not whether the contents of those documents are true." *U.S. ex rel Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139-40 (E.D. Pa. 2012) (citing *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)). Thus, under the 'public records' doctrine, I may only take notice of the existence of the

DHS Report, but cannot take notice of the contents of the DHS Report and compare them to the AG Report or the Complaint. *Id.*

Under the integral document exception, a court may take judicial notice of documents that are "[u]ndisputedly authentic documents integral to or explicitly relied upon in the complaint." *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 496 (E.D. Pa. 2018) (citations omitted). The policy rationale behind the "integral documents" exception is that "it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Schmidt v. Skolas*, 770 F.3d 241, 250 (3d Cir. 2014).

The Court will not take judicial notice of the contents of the DHS Report at this pleading stage. The Pennsylvania General Assembly directed DHS to publish a report for fiscal years 2010-2012. In summation, the DHS Report states that the Auditor's Report improperly considered certain data, that the claw back mechanism was unsupported by the statute, and it recalculated the Extraordinary Expense claims for 2010-2012. While the 'integral documents' doctrine's policy rationale rings exceptionally strong in this case, defendants only first argued for the doctrine's application in their Reply Brief and I am unconvinced that the DHS Report is "integral to" plaintiffs' *claims*.

The Complaint claims that defendants organized a racketeering fraud scheme where they would inflate Extraordinary Expense claims or submit invalid claims so that they would receive a large sum of monies. The complaint does not reference and is not based on the DHS Report, nor does the DHS Report speak directly towards alleged racketeering or fraud. The DHS Report reevaluates the EE Program for fiscal years 2010-2012 and states a disagreement with the Auditor's Report. Therefore, the Court finds that the DHS Report's contents are inadmissible at

this pleading stage as defendants only first argued for the integral documents doctrine application in their Reply Brief, and the DHS Report is not integral to the Complaint.

### III. Discussion

1. The RICO Allegations are Plausible.

The first of three steps on this Motion to Dismiss is to take note of the elements that plaintiffs must plead to state a civil RICO claim under 18 U.S.C. section 1962(c). Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

Plaintiffs must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus an injury to 'business or property.'" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (citations omitted). Here, the RICO claim is predicated on wire fraud, which requires that the allegations of fraud be pled with specificity pursuant to Federal Rule of Civil Procedure 9(b). *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004). Plaintiffs must then plead the "circumstances" of the alleged fraud such as the "date, place or time," or "alternative means of injecting precision and some measure of substantiation into their allegations of fraud," and lastly, "who made [the] misrepresentation to whom and the general content of the misrepresentation." *Id.* at 224.

After recognizing the elements that plaintiffs must plead, the second step is to identify the allegations that are no more than conclusions, which are not entitled to assumption of the truth.

8

The third and final step is to determine whether the well-plead factual allegations plausibly give rise to an entitlement for relief.

The crux of defendants' argument in their Motion to Dismiss is that the DHS Report contradicts the Auditor's Report, which the Complaint entirely relies upon, therefore, the bulk of the Complaint is mere conclusions that are not entitled to assumption of the truth. (ECF #41-1, at 12.) However, as already stated, I will not take notice of the contents of the DHS Report at this pleading stage. Still, the Complaint contains some conclusory boilerplate statements that are not entitled to assumption of the truth.

For example, conclusory statements such as "Lancaster General has already effectively admitted that it would work a serious injustice for it to retain the millions of dollars in overpayments," that the "aim of this scheme was to defraud," and defendants' acts were "deliberate and fraudulent, but in the alternative, [were] unintentional, accidental, and negligent," are conclusions that are not entitled to the assumption of the truth. (ECF #1, ¶ 7, 56, 68.) On the other hand, most of plaintiffs' Complaint adequately alleges a scheme to fraudulently obtain a substantial sum from the EE Program. For example: "The Act prohibits hospitals from submitting invalid or overstated extraordinary expense claims," "Sometime before March 2008, John Doe 1 . . . developed a plan whereby the hospital would pad the claims it submitted to the Commonwealth," and "John Doe 1 and John Doe 2 were again responsible for misrepresentations made to the Commonwealth through submissions," and "By submitting massive numbers of invalid and overstated claims [defendants] unlawfully diverted millions of dollars that should have been paid to the Plaintiffs." (ECF #1, ¶ 31, 43, 45, 4.)

Plaintiffs' allegations of the fraud scheme are strongly supported by the attached Auditor's Report. Seventy hospitals participated in the EE Program, but Lancaster General took

9

home 24% of the total funds available in 2008, 36% in 2009, 47% in 2010, 33% in 2011, and 31% in 2012. In total, between the fiscal years of 2008-2012, the EE Program disbursed approximately $55.9 million, and Lancaster General received $19.4 million of that sum. Plaintiffs' statements along with the Auditor's report that shows these statistics and more sets forth a purported case of a racketeering fraud scheme.

Defendants further argue against the plausibility of plaintiffs' allegations by stating that throughout the time of the EE Program they did nothing illegal, and rather, everything that they did and that the Auditor's report shows is wholly legal conduct.[3] For example, Lancaster states that their claims "were lawful at the time of submission, but became unqualified due to passage of time," and that they "intentionally, but innocently, submitted all potentially eligible claims knowing that the claw-back would fix any resulting overpayments." (ECF #41-1, at 21.) These arguments, along with their other "lawful behavior" arguments, do not overcome the presumption of truth that the Court must provide to the Complaint and its well-pled allegations. Many of these arguments, like those repeated above, are arguments for the future trier of fact to consider when determining whether a racketeering fraud scheme took place.

While I will not take notice of the contents of the DHS Report at this time, I am aware of some of its contents, and I also understand the administrative scheme between DHS and the Auditor General. It is my preliminary understanding that DHS was the agency appointed to administer the EE Program, whereas the Auditor General just audited the EE Program for various years and then DHS explicitly rejected the Auditor's Reports. Given this administrative hierarchy it seems that the DHS Report would supersede the Auditor's Report. This seems to indicate that plaintiffs' case, the foundation for which is the AG report, will require much more

---

[3] Again, I emphasize that the DHS Report is inadmissible at this stage, and that the bulk of defendants' arguments about the implausibility of plaintiffs' allegations relies upon comparing the DHS Report to Auditor's Report.

evidence when attempting to prove a racketeering fraud scheme and illegal conduct at later stages of this litigation.[4]

2. Plaintiffs have standing.

Defendants argue that plaintiffs lack standing, specifically that plaintiffs have not suffered an 'injury in fact' because "receipt of EE Program funds is not an entitlement." (ECF #41-1, at 27 (citing *Sears v. Wolf*, 118 A.3d 1091, 1104 (Pa. 2015).) Article III requires a plaintiff to demonstrate "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (citations omitted).

The statutory subsection at issue states that "[t]he provision of extraordinary expense payments under this section shall not constitute an entitlement derived from the Commonwealth or a claim on any other funds of the Commonwealth." 35 P.S. § 5701.1105(e)(2). Defendants argue that in *Sears*, the Pennsylvania Supreme Court interpreted "nearly identical" language, and it held that a "non-entitlement program" provides "no private cause of action . . . ." (ECF 41-1, at 30.)

Plaintiffs correctly respond that 35 P.S. section 5701.1105(e)(2) does not "somehow extinguish every possible lawsuit that might arise concerning EE Program funds." (ECF #45, at 33.) The subsection importantly states that "this section shall not constitute an entitlement derived from the Commonwealth . . . ." 35 P.S. § 5701.1105(e)(2). Nothing about this subsection precludes private causes of action, such as civil RICO, against private individuals or entities for fraudulent acts. Indeed, in *Sears*, the Pennsylvania Supreme Court found that such language

---

[4] Because I find that plaintiffs have a valid RICO claim under section 1962(c), the RICO conspiracy claim under section 1962(d) will also survive, and I retain jurisdiction over the state law claims.

11

precludes private causes of action against the Commonwealth of Pennsylvania and other government entities and individuals. 118 A.3d at 1104-05. *Sears* does not hold, nor do I read it as holding, that such language precludes private causes of action against private individuals or entities. Therefore, defendants' standing argument is rejected because the "non-entitlement" subsection does not preclude private causes of action against a private entity.

## IV.   Conclusion

For all the reasons above, defendants' Amended Motion to Dismiss is denied as plaintiffs have adequately pled claims that entitles them to relief.

**BY THE COURT:**

**/s/ Jeffrey L. Schmehl**
Jeffrey L. Schmehl, J.